UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GEORGE R. OSBORNE and PATRISHA S.
OSBORNE, d/b/a/ SHERWOOD FOREST,

Plaintiffs,

- *against* -

GERARDO FERNANDEZ, JOHN ROYALL,
ARTHUR FREEHILL, JOHN KEMMERER, JAMES
FOUTS, and THOMAS ANGELL, Individually and
As Members of the Planning Board of The Town of
Stanford,

Defendants.

06 Civ. 4127 (CLB) (LMS)

<u>REPORT AND
RECOMMENDATION</u>

TO:    THE HONORABLE CHARLES L. BRIEANT,
       UNITED STATES DISTRICT JUDGE

Plaintiffs George and Patrisha Osborne, through counsel, commenced the instant

litigation against certain members of the Town of Stanford Planning Board based upon alleged

federal constitutional and state law violations they sustained in connection with their attempt to

subdivide sixty acres of undeveloped property in Dutchess County, New York.  See Docket #1,

Complaint (herein, "Comp.") at ¶21.  Specifically, Plaintiffs maintain that several members of

the Stanford Town Planning Board intentionally delayed and hindered their request to subdivide

their land by requiring the Plaintiffs to comply with unreasonable requests and requirements, by

forcing the Plaintiffs to spend large sums of money during the application process, and by

identifying *de minimis* defects with their permit application as grounds for postponing approval

of their subdivision permit.  During the course of discovery Plaintiff George Osborne, an

attorney previously licensed to practice law in the State of New York, elected to proceed *pro se*

while his wife continued to be represented by counsel.

Following a contentious period of pretrial discovery, the Defendants now move for summary judgment on several grounds seeking total dismissal of the instant action. For the following reasons I conclude, and respectfully recommend that Your Honor should conclude, that the Defendants' respective motions for summary judgment should be granted and that the Plaintiffs' Complaint should be dismissed. Because I recommend that the Plaintiffs' federal causes of action should be dismissed for one or more reasons, I respectfully recommend that there is no need for the Court to reach the challenges posed by the Defendants to the Plaintiffs' state law causes of action and that the Court should decline to exercise supplemental jurisdiction over the remaining pendent state law claims in the absence of any surviving federal claim.

## BACKGROUND

A.    Materials Considered by the Court

Plaintiff George Osborne (herein, "Mr. Osborne"), proceeding *pro se*, and Plaintiff Patrisha Osborne (herein, "Mrs. Osborne"), proceeding through counsel, jointly oppose the instant dispositive motions filed by the Defendants.[1] Defendant Gerardo Fernandez, the Chairman of the Town of Stanford Planning Board during the time period in question in this case (herein, "Defendant Fernandez"), is represented separately from the remaining Defendants, each of whom were members of the Town of Stanford Planning Board at the time of the filing of this

---

[1] It does not appear that either Mr. Osborne or counsel for Mrs. Osborne filed their respective submissions in Opposition to the Defendants' motion for summary judgment with the Clerk of the Court. A copy of the Plaintiffs' respective submissions in opposition were delivered to the Chambers of the undersigned and apparently were served on counsel for the Defendants. In a separate Order dated today, the undersigned has directed the Clerk of the Court to enter these submissions on the docket of this case.

action. The remaining Planning Board Defendants consist of John Royall, Arthur Freehill, John

Kemmerer, James Fouts and Thomas Angell (herein, "Board Defendants"). Defendant

Fernandez and the Board Defendants each have moved for summary judgment seeking dismissal

of the Plaintiffs' Complaint and each have supplied their own 56.1 Statement of Undisputed

Material Facts, documentary evidence in support of their motion, and a Memorandum of Law.

See Docket #38, Board Defendants' Memorandum of Law (herein, "Town Mem."); Docket #39,

Walsh Affirmation (herein, "Walsh Aff."); Docket #41, Town Defendants' Notice of Motion and

56.1 Statement (herein, "Town 56.1 Statement"); see also Docket #47, Defendant Fernandez's

Notice of Motion, Declaration of Brian Sokoloff (herein, "Sokoloff Decl."), and Defendant

Fernandez's 56.1 Statement (herein, "Fernandez 56.1 Statement"); Docket #48, Defendant

Fernandez Memorandum of Law (herein, "Fernandez Mem.").

Mr. Osborne has mounted the primary opposition to the Defendants' dispositive motions,

supplying the required response to the Defendants' 56.1 Statements (herein, "Pls' Opp. to Town

56.1 Statement" and "Pls' Opp. to Fernandez 56.1 Statement"), his own recitation of material

facts requiring trial (herein, "Pls' 56.1 Statement"), a Memorandum of Law in Opposition to

both motions (herein, "Osborne Opp."), and numerous exhibits in support of his opposition

(herein, "Pls' Exhibits"). Counsel for Mrs. Osborne, in an effort to avoid duplication, has joined

in Mr. Osborne's response to the Defendants' 56.1 Statements, in Mr. Osborne's separate

presentation of disputed and undisputed material facts, and in Mr. Osborne's exhibits, and has

filed a separate Memorandum of Law in Opposition to the Defendants' motions for summary

judgment (herein, "P. Osborne Opp."). Defendant Fernandez and the Town Defendants have

replied individually to the Plaintiffs' opposition papers, see Docket #54, Fernandez Reply

Memorandum of Law (herein, "Fernandez Reply"); <u>see also</u> Town Defendants' Reply (herein, "Town Reply") and Affirmation of John Walsh (herein, "Walsh Reply Aff."),[2] and Mr. Osborne has requested leave to file two Sur-reply Memoranda in response to the Defendants' respective Reply Memoranda, <u>see</u> Docket #57, Motion to Serve and File Sur-Reply Memoranda. The Court has read and considered Mr. Osborne's Sur-reply Memoranda, and although the Court does not believe sur-reply memoranda are warranted, the Court grants Mr. Osborne's motion for leave to file his two Sur-reply Memoranda *nunc pro tunc*.

B.    <u>Summary of Applicable State and Local Law</u>

As with almost all local land-use zoning disputes, resolution of a complainant's federal claims turns upon a review and analysis of state and local zoning laws. The following summary of the applicable state and local laws is offered as background to the claims discussed herein.

1.    Stanford Town Code

The Town Board of the Town of Stanford (herein, "Town Board") has empowered the Stanford Planning Board (herein, "Planning Board") to "approve, approve with conditions and disapprove plats for subdivision within the Town of Stanford and to assume all other powers and duties prescribed by Town Law . . . including the promulgation of Land Subdivision Regulations . . . ." <u>See</u> Sokoloff Decl., Ex. A, Stanford Town Code (herein, "Town Code") §140-1. Chapter 140 of the Stanford Town Code governs exclusively the subdivision of land and explains that the Planning Board "consider[s] land subdivision plats as part of a plan for the orderly, economic

---

[2] It also appears from the docket sheet that counsel for the Town Defendants did not file his Reply Memorandum of Law or affirmation with the Clerk of the Court but only served these documents on the Plaintiffs. The undersigned is also directing that these documents be entered on the docket of this case in the previously mentioned order.

and efficient future growth and development of the town consistent with its community character and the continuing needs of its people for quality residential building sites and enjoyable open space." <u>See</u> Town Code §140-2.

Chapter 140 of the Town Code contains the mandatory process an applicant who wishes to subdivide his or her land must follow. <u>See</u> Town Code §140-4 ("Whenever any subdivision of land is proposed . . . the subdivider . . . shall apply for and secure approval of such proposed subdivision in accordance with the following procedures."). The Town Code envisions a multi-tiered process consisting of several proposals submitted by an applicant and several discretionary approvals issued by the Planning Board. Specifically, the Town Code contains a four step process an applicant must follow in order to receive approval to subdivide land: (1) a pre-application meeting with the Planning Board, (2) a sketch plat phase, (3) a preliminary plat phase, and (4) a final plat phase. The first step an applicant must take in order to receive permission to subdivide land is for the applicant to appear before the Planning Board for a pre-application conference to discuss his or her proposed subdivision of land with the Planning Board. <u>See</u> Town Code §140-5(A). The purpose of this pre-application conference is to allow the applicant an opportunity to become familiar with the Town Code's procedural and substantive provisions that govern the subdivision of land. <u>See</u> Town Code §140-5(A)-(B).

Following the pre-application conference with the Planning Board, an applicant is next required to submit a sketch plat of the proposed subdivision of land. <u>See</u> Town Code §140-6(A). The purpose of the sketch plat is to allow the Planning Board an overview of the applicant's proposed subdivision and to assist the Planning Board in classifying the proposed subdivision. <u>Id.</u> The Town Code divides all subdivisions of land into two discrete categories: major

subdivisions and minor subdivisions.  <u>See</u> Town Code §140-6(B).[3]  Major and minor

subdivisions are governed by separate substantive and procedural standards.  The Town Code

defines a minor subdivision as "[a]ny subdivision containing not more than four lots . . . each

fronting on an existing street, not involving any new public or private street or road . . .," and a

major subdivision as "[a]ny subdivision not classified as a minor subdivision, including but not

limited to subdivisions of five or more lots . . . ."  <u>See</u> Town Code §140-3.

      The Town Code directs that an applicant must submit a sketch plat proposal to the Clerk

of the Planning Board fourteen days prior to the Planning Board's regularly scheduled meeting

in order for the sketch plat to be considered and reviewed by the Planning Board during that

meeting.  <u>See</u> Town Code §140-6(A).  Upon receipt of the sketch plat, the Planning Board must

designate the subdivision proposal either as a major subdivision or as a minor subdivision during

one of its regular meetings.  <u>See</u> Town Code §140-6(B).  Following the designation of the

subdivision proposal, the Planning Board "shall within forty-five (45) days after submission

determine whether the sketch plat meets the objectives of [the] regulations and shall, where it

deems necessary, make in writing specific recommendations to be incorporated by the applicant

in the next submission to the Planning Board."  <u>See</u> Town Code §140-6(C)(1).  An applicant

---

[3]  The Town Code also classifies certain subdivision proposals as "cluster subdivisions," which have additional requirements.  <u>See</u> Town Code §140-24.  Although Plaintiffs' application was initially designated as a cluster subdivision, the Defendants submit, and the Plaintiffs do not dispute, that modifications made to the Plaintiffs' application during the permit approval process removed the Plaintiffs' subdivision proposal from the cluster subdivision designation.  <u>See</u> Fernandez 56.1 Statement at ¶¶ 19, 27, 54; Pls' Opp. to Fernandez 56.1 Statement at ¶¶19, 27, 54.
      Plaintiffs maintain that they were forced to change their proposal to one that did not meet the criteria of a cluster subdivision.  For the reasons discussed below, this argument fails to establish a triable issue of fact.

filing a sketch plat for approval must mark the property lines and the bounds of the proposed

subdivision and must also pay a non-refundable fee. <u>See</u> Town Code §140-6(C)(1)-(2). The

Town Code specifies that sketch plat approval does not authorize an applicant to begin

subdividing the property or to begin the process of selling the proposed subdivision lots. <u>Id.</u>

The Town Code lists the requirements for submitting a sketch plat of a proposed major

subdivision as including, *inter alia*, an area map of the subdivision, the general location of all

existing structures, the mapping of soils, the names of the owners of all adjacent property, the

available utilities, documentation on all existing restrictions on the land, and a full environmental

assessment form (herein, "EAF"). <u>See</u> Town Code §140-21(B)(1)-(14).

Once an applicant has received sketch plat approval, the Town Code specifies a series of

steps the applicant must take depending on whether the subdivision proposal has been classified

as a major subdivision or as a minor subdivision. <u>See</u> Town Code §140-7 (applying to minor

subdivisions); Town Code §140-8 (applying to major subdivisions). As there is no dispute that

the Plaintiffs' proposed subdivision qualified as a major subdivision, only the major subdivision

requirements will be summarized. Section 140-8(A) directs that an applicant "shall file an

application for consideration of a preliminary plat of the proposed subdivision" within six

months of the Planning Board's classification of the sketch plat as a major subdivision and shall

pay an additional non-refundable fee. The Town Code specifies that the preliminary plat and its

supporting documents are intended to assist the Planning Board's review of a proposed

subdivision and must "in all respects comply with the requirements of §§ 276 and 277 of the

Town Law and these regulations . . . ." <u>See</u> Town Code §§140-8(A), (B)(1). The Town Code

also specifies that approval of the preliminary plat "does not constitute an approval of the final

plat" and that such preliminary approval, if granted, should not be used as the basis to begin work on the proposed subdivision. <u>See</u> Town Code §140-8(B)(2).

Upon receipt of the preliminary plat documents, the Planning Board is charged with the responsibility of reviewing the proposed subdivision, "taking into consideration the requirements of the community and the best use of the land being subdivided." <u>See</u> Town Code §140-8(E). The Town Code suggests that the Planning Board should consider issues such as public access to the subdivision, water supply, topography, sewage disposal and drainage, and possible future development of lands when considering an applicant's preliminary plat, and that the Planning Board "may consult with its private planning, engineering and legal consultants, as well as other town officials, boards, agencies and departments." <u>Id.</u>

The Planning Board must hold a public hearing on an applicant's proposed subdivision within forty-five days of receiving a complete preliminary plat application. <u>See</u> Town Code §140-8(F)(1). Although the Town Code does not define the term "complete preliminary plat application," N.Y. Town Law §276, which must be read in conjunction with the Town Code, directs that a preliminary plat shall not be considered complete "until a negative declaration has been filed or until a notice of completion of the draft environmental impact statement has been filed in accordance with the provisions of the state environmental quality review act." N.Y. Town Law §276(5)(c).[4] The Town Code explains that major subdivision preliminary plat requirements include a complete subdivision application, payment of the application fee, and any updated information about the site of the proposed subdivision. <u>See</u> Town Code §140-22.

---

[4] These terms, which are derived from New York statutory law, are described more fully below.

The Town Code further requires that "[w]ithin forty-five (45) days from the date of such public hearing, the Planning Board shall act by resolution on the preliminary plat." See Town Code §140-8(F)(3). The Planning Board is empowered to approve the applicant's preliminary plat, approve the applicant's preliminary plat with modifications, or disapprove of the applicant's preliminary plat. See Town Code §140-8(F)(3). The Town Code mandates, however, that the Planning Board's failure to act upon an applicant's complete preliminary plat application within this forty-five day window "shall be deemed approval of the preliminary plat in accordance with the provisions of § 276 of the Town Law." See Town Code §140-8(F)(3). As described more fully below, N.Y. Town Law §276 contains several default approval provisions that take effect in the event that a planning board fails to act upon a complete preliminary plat application or upon a final plat application within certain statutory time periods.

Following the Planning Board's review and approval of an applicant's preliminary plat application, the applicant must prepare a final plat. See Town Code §140-9. An applicant's final plat application must be submitted to the Town Board within one hundred and eighty days after the Planning Board approves the preliminary plat. See Town Code §140-9(A)(2). Analogous to the procedures for preliminary plat approval, the procedure for final plat approval requires that the Planning Board hold a public hearing on the applicant's final plat application within forty-five days of receiving the final plat application. See Town Code §140-9(D)(1). The Planning Board, however, does not have to hold a public hearing on the applicant's final plat application. Id. If the Planning Board does not hold such a public hearing the Planning Board must act on the applicant's final plat application within forty-five days of receipt of the applicant's final plat submissions. Id. Similar to the default approval process for preliminary

plat approval, there also exists a default approval process of an applicant's final plat: a final plat application will be deemed approved by default if the Planning Board fails to act on the final plat application within this forty-five day window.  See Town Code 140-9(D)(2).

        2.      N.Y. Town Law and SEQRA

The provisions of the Town Code are informed by the statutory provisions of the N.Y. Town Law and the N.Y. Environmental Conservation Law.  N.Y. Town Law §276 establishes the statutory guidelines a planning board must follow when reviewing preliminary and final plat applications.  See N.Y. Town Law §276(5), (6).  N.Y. Town Law §276(5) outlines the requirements for reviewing and approving preliminary plats and §276(6) outlines the requirements for reviewing and approving final plats.  Each of these provisions contains procedural requirements planning boards must follow, including holding public hearings, making decisions and findings about possible environmental impacts of proposed subdivisions, and rendering preliminary and final approval to applicants to subdivide their land.  N.Y. Town Law explicitly requires that the "planning board shall comply with the provisions of the state environmental quality review act . . ." when reviewing proposed subdivisions of land.  See  N.Y. Town Law §276(5)(b).

As discussed above, N.Y. Town Law contains the definition of a complete preliminary plat application.  N.Y. Town Law §276(5)(c) directs that a preliminary plat application shall be considered complete either when a negative declaration has been issued or when a notice of completion of the draft environmental impact statement has been filed by the lead agency. Section 276(5)(c) further specifies that "[t]he time periods for review of a preliminary plat [by the planning board] shall begin upon filing of such negative declaration or notice of completion."

The terms lead agency, negative declaration, and draft environmental impact statement come from Article Eight of the New York State Environmental Quality Review Act, N.Y. Envtl. Conserv. Law, 8-0101, *et. seq*. (herein, "SEQRA"), and are governed by procedural provisions contained within the Compilation of Codes, Rules and Regulation of the State of New York, <u>see</u> 6 N.Y.C.R.R. §617.  SEQRA requires that a lead agency must be designated when two or more state or local agencies are involved in the review and approval process of an application for an alteration to land that might have an impact on the environment.  <u>See</u> SEQRA §8–0111(6).  A lead agency assumes the "principal responsibility for carrying out or approving" the SEQRA process.  <u>Id.</u>  A negative declaration is a written determination issued by the lead agency that a land-use proposal "will not result in any significant adverse environmental impacts."  <u>See</u> 6 N.Y.C.R.R. §617.2(y).  A positive declaration, by contrast, is a written statement by the lead agency that a proposed alteration to land will have an adverse impact on the environment and that therefore "an environmental impact statement [is] required."  <u>See</u> 6 N.Y.C.R.R. §617.2(ac). The preparation and requirements of an environmental impact statement (herein, "EIS") are governed by SEQRA's complex statutory regime.

A lead agency's decision to issue a negative declaration, or to issue a positive declaration which triggers the need to produce an EIS, is initiated by an applicant filing an environmental assessment form ("EAF").  A referenced above, an EAF is one of several components of an applicant's major subdivision sketch plat application.  <u>See</u> <u>supra</u> at p. 7 (citing Town Code §140-21(14)).  An EAF is "a form used by an agency to assist [] in determining the environmental significance or nonsignificance of issues."  6 N.Y.C.R.R. §617.2(m).  The degree of specificity required in an applicant's EAF depends on the classification of his or her proposal.  <u>See</u> 6

N.Y.C.R.R. §617.6.  If an applicant's action is classified as Type I or Unlisted, a full EAF may have to be prepared.  See 6 N.Y.C.R.R. §617.6(a)(2), (3).  Type I actions are particular actions that are more likely than not to have some impact on the environment, see 6 N.Y.C.R.R.§617.4, and Unlisted actions are those actions that are not classified either as Type I actions or as Type II actions, see 6 N.Y.C.R.R. §617.2(ak).  Type II actions are defined as those actions that never require the preparation of an EIS.  See 6 N.Y.C.R.R. §617.2(aj); §617.5.  Completion of an EAF is a prerequisite to a lead agency issuing a negative declaration or a positive declaration unless the agency waives the requirement that an EAF be prepared because a draft EIS already has been prepared or submitted.  See 6 N.Y.R.C.C. §617.6(a)(4).

N.Y. Town Law contains certain default provisions providing for default approval of preliminary and final subdivision applications in the event that the planning board does not act on complete preliminary or final plat applications within specified periods of time.  See N.Y. Town Law §276(8).  Section 276(8) authorizes the default approval of complete preliminary plats or complete final plats "[i]n the event that a planning board fails to take action on a preliminary plat or a final plat within the time prescribed thereof after completion of all requirements under the state environmental quality review act . . . ."  N.Y. Town Law §276(8).  N.Y. Town Law creates a sixty-two day window within which a planning board must hold a public hearing on a complete preliminary plat application following the completion of all SEQRA requirements, see N.Y. Town Law §276(5)(d), and also imposes a time period within which a planning board must issue its factual findings following a public hearing, id. at §276(5)(d)(iii).  N.Y. Town Law creates similar mandatory time periods for the planning board's review and consideration of final plats.  See N.Y. Town Law §276(6).

The Compilation of Codes, Rules and Regulations of the State of New York establishes the time periods within which certain actions under SEQRA must be taken. For example, the N.Y.C.R.R. mandates that an agency should specify the classification of an action – that is the classification of an action as Type I, Type II, or Unlisted – as early as possible, <u>see</u> 6 N.Y.C.R.R. §617.6(a)(1), and that when only one agency is involved and an action is classified as a Type I or Unlisted action, that agency "must determine the significance of the action within 20 calendar days of its receipt of the application, an EAF, or any additional information . . . ," <u>see</u> <u>id.</u> at §617.6(b)(1)(i). The N.Y.C.R.R. also outlines the standards an agency must use when reviewing and assessing the significance of a proposed action, <u>see</u> 6 N.Y.C.R.R. §617.7, and further delineates the fees an applicant must pay, the number of copies an applicant must provide, and the procedures an agency must follow when working with other agencies or the federal government, <u>see</u> 6 N.Y.C.R.R. §§617.7, 617.12, 617.13.

C.     <u>Facts</u>

The following facts are drawn from the Plaintiffs' Complaint and the respective 56.1 Statements submitted by the parties. The following facts are assumed to be true for the purposes of this motion and are undisputed unless otherwise noted. The facts of the case are construed in favor of the non-moving Plaintiffs and all reasonable inferences are drawn in their favor. <u>See</u> <u>Mount Vernon Fire Ins. Co. v. Belize NY, Inc.</u>, 277 F.3d 232, 236 (2d Cir. 2002). Although Plaintiff George Osborne is now proceeding *pro se*, counsel for Mrs. Osborne drafted and filed the Complaint on behalf of Mr. and Mrs. Osborne, thus negating any need to construe the Complaint under the charitable *pro se* standard typically afforded *pro se* filings. <u>See</u> <u>Haines v. Kerner</u>, 404 U.S. 519, 520 (1972); <u>Simmons v. Abruzzo</u>, 49 F.3d 83, 87 (2d Cir. 1995).

Additionally, because Mr. Osborne is a former licensed attorney who is familiar with the legal system, evaluating his arguments and assertions in Opposition to the instant motions under the lenient *pro se* standard is not warranted. See, e.g., Davidson v. Flynn, 32 F.3d 27, 31 (2d Cir. 1994) (suspending the use of liberal *pro se* standard when presented with the claims of an experienced *pro se* litigant).

Plaintiffs own one hundred and thirty two acres of land in the town of Stanford, located in Dutchess County, New York. See Comp. at ¶20. Plaintiffs began the process of subdividing their land into seven separate plats of land, six of which were slated for additional development, in June of 2004. See Comp. at ¶21; Town 56.1 Statement at ¶1. Plaintiffs proposed that six homes would be built on six ten acre plats of land and that the remaining seventh larger plat of land would remain in Plaintiff Patrisha Osborne's name as a horse farm. See Town Defs' 56.1 Statement at ¶1. It is undisputed that the Plaintiffs revised their proposal to subdivide their land several times during the review process and that the final subdivision proposal included dividing the land as explained above. See Fernandez 56.1 Statement at ¶¶27, 30, 54.

Plaintiffs appeared before the Town Planning Board on September 29, 2004, for a pre-application conference to begin the process of subdividing their land. See Comp. at ¶22; Fernandez 56.1 Statement at ¶18; Town 56.1 Statement at ¶10. Following the Plaintiffs' pre-application conference with the Planning Board, Plaintiffs' proposal to subdivide their land was forwarded to David Clouser, the Planning Board's consulting engineer, for review. See Fernandez 56.1 Statement at ¶20; Town Defs' 56.1 Statement at ¶10. Mr. Clouser prepared an initial report on October 25, 2004, in which he identified two areas that had to be addressed in order to move the Plaintiffs' application forward. See Fernandez 56.1 Statement at ¶20; see also

Sokoloff Decl., Ex. E. In his October 2004 report, Mr. Clouser noted that the Plaintiffs'

proposal, which at that time was classified as a cluster subdivision under Town Code §140-24,

required the construction of a private road, which itself triggered the need to establish an open

development area under New York Town Law §280-a. See Sokoloff Decl., Ex. E. Under N.Y.

Town Law §280-a(4), a town board may establish an open development area "wherein permits

may be issued for the erection of structures to which access is given by right of way or easement.

. . ." N.Y. Town Law §280-a(4). Section 280-a(4) specifies that where a Town Board has

created a Planning Board, "the town board, before establishing any such open development area

or areas, shall refer the matter to such planning board for its advice and shall allow such planning

board a reasonable period of time to report." Mr. Clouser additionally identified that the

Plaintiffs would be required to "provide a narrative describing how the proposed subdivision

layout would conform to the purposes and objectives of a residential cluster subdivision" and

that the Plaintiffs would be required to meet all New York state environmental review

requirements. See Sokoloff Decl., Ex. E. Mr. Clouser concluded that "the residential cluster

subdivision appears attainable for this proposed property . . . ." Id.

Plaintiffs contend that the Defendants' attempts to undermine their proposed subdivision

began with the receipt of Mr. Clouser's October 25, 2004, report. In their Complaint, Plaintiffs

assert that "[c]ontrary to the express mandate of the Town Law, the Planning Board Engineer, in

a report to the Planning Board dated October 25, 2004, reversed the process [of applying for an

open development area resolution] and stated that Plaintiff must first make application to the

Town Board for the ODA [open development area]." See Comp. at ¶28. Mr. Osborne reaffirms

that Mr. Clouser provided him misinformation about the process of applying for an open

development area resolution in his 56.1 Statement, contending that Mr. Clouser's report informed the Plaintiffs that the first step toward subdividing the property was to apply for an open development area resolution from the Town Board and not from the Planning Board. <u>See</u> Pls' 56.1 Statement at ¶8. A review of Mr. Clouser's October 25, 2004, report, however, reveals that Mr. Clouser noted that an open development area resolution was required and that this process "must be by a resolution adopted by the Town Board, with referral to the Planning Board for recommendations." <u>See</u> Sokoloff Decl., Ex. E (report of Mr. Clouser dated October 25, 2004); <u>see</u> Pls' Exhibits, Volume III, Ex. O (same document with same Bates stamp number). Respectfully, Mr. Clouser's October 25, 2004, report does not direct the Plaintiffs to apply directly to the Town Board for the open development area resolution or to ignore the Planning Board as the Plaintiff contends.

Plaintiffs also argue that this misinformation was reaffirmed by the Planning Board itself, and specifically by Defendant Fernandez, during a Planning Board meeting on October 27, 2004. In his 56.1 Statement, Mr. Osborne states that "[a]t the Planning Board meeting in October, Chairman Fernandez agreed that this was the correct first step and sent plaintiffs to the Town Board." <u>See</u> Pls' 56.1 Statement at ¶9 (citing Pls' Exhibits, Volume III, Ex. N, Minutes from October 27, 2004, meeting). A review of the Planning Board's meeting minutes from its October 27, 2004, meeting only discloses the following pertaining to Plaintiffs' subdivision application, "The board and the applicant continued the discussion initiated at the September 29, 2004[,] meeting. A review of the letter from Mr. Clouser, Board Consultant, was discussed. It outlines the process that the applicant must follow since this is a pre-application conference. Mr. Fernandez asked the applicant to furnish a narrative." <u>See</u> Pls' Exhibit, Volume III, Ex. N,

Minutes from October 27, 2004, Planning Board Meeting at Bates Stamp number 000553.

Mr. Osborne alleges that he appeared before the Town Board in November of 2004 based upon the Planning Board's improvident instruction and requested that the Town Board pass an open development area resolution. <u>See</u> Pl's 56.1 Statement at ¶10. Mr. Osborne explains, however, that the Town Board informed him that he approached the Town Board prematurely and that the Planning Board, pursuant to N.Y. Town Law §280-a, was required to produce a recommendation to the Town Board before the Town Board could act upon the Plaintiffs' request. <u>Id.</u>; <u>see also</u> Pls' Exhibits, Volume I, Ex. C, Affidavit of Dennis Pryzgoda. On November 10, 2004, the Town Board passed a resolution outlining the proper process the Plaintiff should follow. <u>See</u> Pls' 56.1 Statement at ¶11; <u>see also</u> Pls' Exhibits, Volume III, Ex. S, Resolution #29, dated November 10, 2004. In the resolution the Town Board states that "pursuant to N.Y. Town Law section 280-a(4), the Town Board is required to refer the matter of the consideration of an open development area to the Planning Board for its advice . . . [but] such referral is not, nor intended to be, [a] decision or determination that such open development area should or should not be made or granted." <u>See</u> Pls' Exhibits, Volume III, Ex. S. The Town Board concluded its resolution by affirmatively referring the possible open development area resolution to the Planning Board for review. <u>Id.</u>

In connection with this confusion, Plaintiff states that Mr. Clouser subsequently admitted to him that "the erroneous 'first step' instruction in his Report was inserted after a telephone conversation with [Defendant] Fernandez, in October 2004 who told him to include it." <u>See</u> Pls' 56.1 Statement at ¶13. Plaintiffs cite their own Complaint for evidentiary support of this putative material fact. <u>See</u> <u>id.</u> (citing Pls' Exhibits, Volume I, Ex. G, Complaint at ¶29.).

Paragraph 29 of the Complaint, which is an allegation, and not evidence, states that "Plaintiffs were later informed and believe, that the Planning Board Engineer was instructed by the Planning Board Chairman, the defendant Gerardo Fernandez, to write the report incorrectly and improperly directing the Plaintiffs to the Town Board." See Comp. at ¶29.

Following the Town Board's November 10, 2004, referral of the Plaintiffs' request for an open development area to the Planning Board, the Planning Board was unable to act on the Plaintiff's application until January of 2005 because of an absence of a quorum of members for its November meeting and because the Planning Board did not have a meeting scheduled in December. See Fernandez 56.1 Statement at ¶26; Town Defs' 56.1 Statement at ¶19; Pls' 56.1 Statement at ¶14. On January 5, 2005, Plaintiffs, through their engineer Mark Graminski, submitted their sketch plat subdivision application documents to the Planning Board. See Fernandez 56.1 Statement at ¶27; Sokoloff Decl., Ex. I; Pls' Exhibits, Volume II, Ex. I. Accompanying this application was Part One of an Environmental Assessment Form (herein, "EAF") completed by Plaintiffs' engineer, Mr. Graminksi. See Sokoloff Decl., Ex. J.

The Planning Board's engineer, Mr. Clouser, prepared a second report, this time based upon the Plaintiffs' January 2005 sketch plat application materials. See Fernandez 56.1 Statement at ¶30; Town Defs' 56.1 Statement at ¶20. Mr. Clouser's second report, dated January 25, 2005, offered comments on the Plaintiffs' January 5, 2005, application and identified several areas of concern. See Sokoloff Decl., Ex. K. Among Mr. Clouser's concerns were issues pertaining to public access of the development, compliance with parkland preservation and open space requirements, and verification of federal wetlands. Id. Although both Plaintiffs' January 5, 2005, application and Mr. Clouser's January 25, 2005, report were slated for discussion at the

Planning Board's January 26, 2005, meeting, the Planning Board's minutes reflect that the Plaintiffs were not present at the meeting when their application was presented for review before the Planning Board. <u>See</u> Sokoloff Decl., Ex. L, Minutes of January 26, 2005, Planning Board Meeting; <u>see also</u> Pls' Exhibits, Volume III, Ex. N, Minutes of January 26, 2005, Planning Board Meeting. Plaintiffs maintain that they were unable to attend the Janury 26, 2005, Planning Board meeting due to inclement weather.

Plaintiffs' application was again discussed by the Planning Board during its February 23, 2005, meeting. <u>See</u> Sokoloff Decl., Ex. N, Minutes of February 23, 2005, Planning Board Meeting; <u>see also</u> Pls' Exhibits, Volume III, Ex. N, Minutes of February 23, 2005, Planning Board Meeting. The Planning Board meeting minutes reflect that "Mr. Fernandez made a motion to schedule a Special Meeting for March 9, 2005[,] to review and discuss [the Plaintiffs'] application." <u>Id.</u> The March 9, 2005, minutes of the Planning Board disclose that only two applications were discussed by the Planning Board that evening: Plaintiffs' application to subdivide their land and a separate "self storage application." <u>See</u> Sokoloff Decl., Ex. O; <u>see</u> Pls' Exhibits, Volume III, Ex. O. From the minutes provided to the Court, it appears that the Plaintiffs' application was the primary focus of the Planning Board's meeting. <u>Id.</u> During this meeting the Planning Board members reviewed the application materials submitted by the Plaintiffs and discussed a number of "areas of concern," including enforcement of open space provisions on the proposed plats of land, soil testing, the open development area resolution referred to it by the Town Board, compliance with the Town Code, and the impact the Plaintiffs' proposed development would have on a nearby lake. <u>See id.</u> The meeting minutes reflect that a large audience was present and that a number of public speakers raised specific concerns about

the potential impact of the Plaintiffs' subdivision on the lake.  <u>Id.</u>

Plaintiffs categorize the events of the March 9, 2005, Planning Board meeting differently. Plaintiffs' argue in their 56.1 Statement that Defendant Fernandez "announced that the Planning Board would continue to take no action on plaintiffs' application, because before he would permit any review of the application, first, 'there would be a need to obtain the approval of the Town Board[,]' an action Fernandez knew was contrary to the Town Board's previous ruling and contrary to N.Y. State law."  <u>See</u> Pls' 56.1 Statement at ¶17.

The Planning Board again discussed Plaintiffs' subdivision proposal during its regularly scheduled March 30, 2005, meeting.  <u>See</u> Fernandez 56.1 Statement at ¶44; Town Defs' 56.1 Statement at ¶23; Pls' 56.1 Statement at ¶18.  The Planning Board's minutes contain the following notation about Plaintiffs' application, "Applicant stated he would like to take the Planning Board's considerations regarding the open development zone to the Town Board meeting of April for their action.  Mr. Fouts made the motion to forward to the Town Board information regarding the Sherwood Forest subdivision so that the Town Board can decide if they are going to grant an open development zone for this project."  <u>See</u> Sokoloff Decl., Ex. S; Pls' Exhibits, Volume III, Ex. N.  Plaintiffs submit that the Planning Board reluctantly agreed to this course of action after "plaintiff complained that the Board was doing nothing, and stated that the Board should either go about properly considering the application or send the matter to the Town Board with a favorable recommendation so that the Board might grant an ODA resolution."  <u>See</u> Pls' 56.1 Statement at ¶18.  Plaintiffs also allege that Defendant Fernandez "agreed" to refer the matter back to the Town Board but stated that he "refused . . . to inform the Board members or the applicant what his recommendations would say."  <u>Id.</u>  In support of this

assertion, Plaintiffs cite their own Complaint and the minutes of the March 30, 2005, meeting

quoted above.  Id.

Following the March 30, 2005, Planning Board meeting, Defendant Fernandez authored a

memorandum to the Town Board, dated April 11, 2005, in which he advised the Town Board of

the following:

> It is necessary for the Town Board to provide direction to the Planning Board
> with respect to the review of the subdivision application submitted by George
> Osborne.  To continue to the review as presented, it is necessary for an open
> development zone to be established/authorized by the Town Board.  There is no
> requirement that such zone be approved by the Town Board.  If the open
> development zone is not approved by the Town Board, the applicant would need
> to find a different format for the subdivision.

See Sokoloff Decl., Ex. T; Pls' Exhibits, Volume III, Ex. R.  Plaintiffs classify this memorandum

as a knowing attempt on the part of Defendant Fernandez to distort the process of the Town

Board reviewing and approving the open development area resolution.  See Pls' 56.1 Statement

at ¶19.  Plaintiffs also attribute significance to Defendant Fernandez's comment in his

memorandum that the Town Board was under no obligation to approve the open development

area and suggest that this comment was perceived by "at least one Town Board member at the

meeting on April 11, 2005[,]" as an "invitation to terminate the project entirely."  See id. at ¶20.

In support of this assertion, however, Plaintiffs only cite Defendant Fernandez's own

memorandum dated April 11, 2005; Plaintiffs offer no other citation to evidence that would

support their assertion that one of the Town Board members perceived Defendant Fernandez's

memorandum in this manner.  Plaintiffs also allege in their 56.1 Statement that "the members of

the Town Board strongly criticized Chairman Fernandez's repeated refusal to comply with the

N.Y. State Town Law.  One member, Timothy Marriott, stated, 'Gerry you're supposed to do

your job, not come here and ask us to do it.' " <u>See</u> Pls' 56.1 Statement at ¶21. As evidence for this putative factual assertion, however, Plaintiffs only cite their own pleading. <u>Id.</u> (citing Complaint at ¶42).

On April 18, 2005, David Tetor, Town Supervisor for the Town of Stanford, "return[ed] the letter [Defendant Fernandez] submitted to the Town Board regarding the Sherwood Forest Subdivision on April 11, 2005," with the following observation, "We look forward to the Planning Board's recommendation(s) and guidance on this development." <u>See</u> Sokoloff Decl., Ex. U; Walsh Aff., Ex. R. The Planning Board discussed Plaintiffs' application to subdivide their property during the April 27, 2005, meeting following the return of Defendant Fernandez's April 11, 2005, memorandum from the Town Board. <u>See</u> Fernandez 56.1 Statement at ¶47; Town 56.1 Statement at ¶25. The meeting minutes note that, "Mr. Fernandez stated that since the Planning Board had to make the recommendation to the Town Board regarding an open development zone, the applicant would have to perform all of the work required by the Planning Board with respect to the review of the application and resolve any issues that would come up in the review." <u>See</u> Sokoloff Decl., Ex. V; Pls' Exhibits, Volume III, Ex. N. The minutes make clear that the Planning Board was aware of its responsibility to make a recommendation to the Town Board and that "when all issues and needs were resolved to the satisfaction of the Planning Board, the Planning Board would be in a position to recommend to the Town Board the establishment of an open development zone . . . ." <u>Id.</u>

Plaintiffs allege that the course of action that followed the Planning Board's April 27, 2005, meeting evinces the Defendants' collective bad faith endeavors to delay and prevent the Plaintiffs from subdividing their property. Plaintiffs suggest that the conditions that they had to

meet to convince the Planning Board to make a recommendation to the Town Board about the open development area under N.Y. Town Law §280-a and to issue initial sketch plat approval of the Plaintiffs' proposed subdivision far exceeded any other set of requirements ever imposed by the Planning Board on other applicants. See Pls' 56.1 Statement at ¶27. Among these excessive disparate requirements alleged by the Plaintiffs are, *inter alia*, mandates that the Plaintiffs perform site work on their property, complete property line and wetland surveys, compile and present data on easements, covenants and restrictions applicable to the Plaintiffs' property, and revise project narratives. See Pls' 56.1 Statement at ¶26. In support of their argument that these requirements were excessive and not required of other applicants, Plaintiffs submit the affidavit of Mark Graminski, their retained project engineer, who affirms that he has worked on "four or five major subdivision applications in the Town of Stanford," and that he has "never experienced a request by a town planning board for such an unusually large set of requirements for sketch approval." See Pls' Exhibits, Volume I, Ex. B, Affidavit of Mark Graminski at ¶¶3, 28.

The Planning Board took no official action on the Plaintiffs' subdivision application during the months of May, June, and July of 2005. Defendants attribute this inaction to the fact that the Plaintiffs informed the Planning Board that they had nothing to report to the Planning Board during its May 25, 2005, meeting, and that the Plaintiffs withdrew their requests to be placed on the June 2005 Planning Board agenda. See Fernandez 56.1 Statement at ¶¶51-53; Town 56.1 Statement at ¶¶26-28. On June 27, 2005, Plaintiff George Osborne corresponded with the Planning Board and informed them that he "anticipate[d] deliver[ing] . . . a complete package, showing full compliance with Mr. Clouser's list of requirements and also including other matters reflecting the status of our application, by July 13th, two weeks before the

Planning Board meeting on July 27, 2005." <u>See</u> Sokoloff Decl., Ex. BB; Walsh Aff., Ex. U. Plaintiff referenced that many of the requirements Mr. Clouser had previously identified as being prerequisites to the Planning Board considering the Plaintiffs' application, including completion of boundary surveys, completion of wetlands surveys, performance of percolation testing, and completion of topographical maps and charts, either had been satisfied or would be satisfied in time for the July 2005 Planning Board meeting. <u>Id.</u>; <u>see also</u> Pls' 56.1 Statement at ¶30.

Plaintiffs submitted a revision to their initial application for sketch plat site approval to the Planning Board on July 13, 2005. <u>See</u> Fernandez 56.1 Statement at ¶54; Town 56.1 Statement at ¶29; <u>see also</u> Sokoloff Decl., Ex. CC. Differing from Plaintiffs' initial sketch plat application filed on January 3, 2005, Plaintiffs' revised application contained a slightly larger acreage of property subject to subdivision and proposed creating six new building plats as opposed to eight. <u>Compare</u> Sokoloff Decl., Ex. I, <u>with</u> <u>id.</u>, Ex. CC. The Planning Board considered Plaintiffs' revised application at its regularly scheduled July 27, 2005, meeting. <u>See</u> Fernandez 56.1 Statement at ¶55; Town 56.1 Statement at ¶30; Pls' 56.1 Statement at ¶31. The minutes from the July 27, 2005, meeting reference Plaintiffs' frustration with the progress of their application and note that they requested that the Planning Board grant sketch approval of their application. <u>See</u> Sokoloff Decl., Ex. DD; Pls' Exhibits, Volume III, Ex. N. The minutes note that, "Mr. Fernandez stated that the board would do everything they would to expedite the project. Action will be placed on the September 28, 2005[,] agenda." <u>Id.</u> Plaintiffs contend, however, that Defendant Fernandez "intentionally contrived to have the Board's engineer, Mr. Clouser, fail to review anything which plaintiff had submitted and to prepare his usual Report and fail to attend the [July 27, 2005,] meeting." <u>See</u> Pls' 56.1 Statement at ¶31.

Mr. Clouser produced a review and report of the Plaintiffs' July 2005 revised sketch plat application on August 23, 2005. See Fernandez 56.1 Statement at ¶56; Town 56.1 Statement at ¶31; see also Sokoloff Decl., Ex. EE. Akin to his earlier review of Plaintiffs' January 2005 submission, Mr. Clouser identified certain areas that the Planning Board should consider when evaluating the Plaintiffs' revised July 2005 sketch plat application. See Sokoloff Decl., Ex. EE. In addition to these areas of consideration, Mr. Clouser also observed that "the Town's Sketch Plan requirements (§140-21 of the Subdivision Code) have been met by the plans submitted so that the Board may consider this step in the subdivision review and approval process. Additional information is also required prior to considering this application as complete for the purposes of its required SEQRA review. Prior to consideration by the Board of Preliminary subdivision approval, additional information as specified in the Town Subdivision Code §140-22 must also be met." Id.

The Planning Board granted the Plaintiffs sketch plat approval during its regularly scheduled meeting on September 28, 2005. See Town 56.1 Statement at ¶32; Pls' 56.1 Statement at ¶33; see also Sokoloff Decl., Ex. FF; Pls' Exhibits, Volume III, Ex. N. The Planning Board's minutes reflect that the Plaintiffs' application was classified as a major subdivision because it proposed to subdivide the property into more than five lots. See Town Code §140-3. At this time the Planning Board also scheduled a public hearing on the Plaintiffs' subdivision application, which was held on October 26, 2005. A number of community residents spoke about the Plaintiffs' proposed subdivision during the October 26, 2005, public hearing and expressed concerns about the impact of the proposed development on a nearby lake and what precedent, if any, the approval of the Plaintiffs' proposal would set for other proposed

developments in the community.  See Sokoloff Decl., Ex. GG; Pls' Exhibits, Volume III, Ex N.

The minutes pertaining to Plaintiffs' proposal conclude with a request from one of the

community members to leave the hearing open "until all questions and concerns were

addressed."  See id.  The Planning Board reopened the public hearing on Plaintiffs' proposal

during its next regularly scheduled meeting on November 16, 2005.  See Fernandez 56.1

Statement at ¶62; Town 56.1 Statement at ¶35.  After receiving the additional comments from

one member of the community who again raised concerns about possible pollution affecting the

nearby lake and about road construction, Defendant Fernandez declared the public hearing on the

Plaintiffs' application closed.  See Sokoloff Decl., Ex. HH; Pls' Exhibits, Volume III, Ex. N.

        The Planning Board appears to have spent a significant amount of time on the Plaintiffs'

application during its November 16, 2005, meeting.  The minutes contain a detailed account of

several outstanding concerns and issues surrounding Plaintiffs' application, including

enforcement of tree preservation conditions, safety and maintenance of the proposed roadway on

the subdivided property, additional requirements needed for complete SEQRA review, and the

Plaintiffs' need to provide answers to questions posed by Mr. Clouser.  Id.  The minutes on this

topic conclude with the following notation, "Mr. Fernandez stated that applicant needs to meet

time frame requirements if they want their documents to be discussed at the January 25, 2006[,]

meeting.  All parts of Mr. Clouser's documents need to be answered timely."  Id.

        Mr. Clouser prepared a third report on the Plaintiffs' subdivision application on

November 28, 2005.  See Fernandez 56.1 Statement at ¶65; Town 56.1 Statement at ¶36.  Mr.

Clouser's November 2005 report notes that he was "requested by the Applicant [Plaintiffs

George and Patrisha Osborne] to prepare an updated list of outstanding issues that must be

addressed for the [Plaintiffs'] proposed subdivision development." <u>See</u> Sokoloff Decl., Ex. II. Mr. Clouser listed the documents and other materials he reviewed in preparation of his November 2005 report and listed eight areas "that [he] believe[d] have been adequately addressed by the most recent plan revisions and supplemental information" and twenty-three areas "that the Applicant needs to address. . . ." <u>Id.</u> Some of the areas identified by Mr. Clouser as needing work included substantive issues, such as information on possible pollution prevention and documentation on the ownership and maintenance of the roadways and open spaces, as well as clerical and typographical changes that needed to be made. <u>Id.</u> Mr. Clouser noted at various points in his report that Plaintiffs' compliance with several of the aforementioned issues was required for SEQRA compliance and for the Planning Board to complete its review and recommendation of the open development area resolution to the Town Board. <u>Id.</u>

Following a hiatus in December, the Planning Board resumed meeting in January of 2006. Prior to the January 25, 2006, meeting of the Planning Board, Mr. Clouser issued another correspondence to the members of the Planning Board in an effort to update the Board on the progress and status of the Plaintiffs' application. <u>See</u> Fernandez 56.1 Statement at ¶¶71, 72; Town 56.1 Statement at ¶38. In his January 19, 2006, letter to the Planning Board, Mr. Clouser informed the Planning Board that "[a]ll requirements necessary for consideration of preliminary approval [of the Plaintiffs' subdivision application] have been substantially addressed." <u>See</u> Sokoloff Decl., Ex. LL. In contrast to his previous correspondence to the Board dated November 28, 2006, Mr. Clouser's January 19, 2006, correspondence only identified six "outstanding issues [that] must be addressed for the above referenced proposed subdivision development prior

27

to consideration of final subdivision approval." Id. The six areas identified by Mr. Clouser included (1) finalizing the grading of the roadway; (2) submitting the final grading of the roadway to the Fire Department and Building Inspector; (3) submitting an "as-built" drawing for the final roadway alignment; (4) receiving final approval for water supply and wastewater disposal systems from Dutchess County; (5) finalizing stormwater management design and submit for approval; and (6) providing completed project documents to the Planning Board's attorney for review and approval. Id.

Plaintiffs' application and Mr. Clouser's January 19, 2006, correspondence were reviewed and discussed by the Planning Board during its January 25, 2006, meeting. See Fernandez 56.1 Statement at ¶72. Although there was some discussion among the Planning Board members as to the process for completing the open development area resolution review for the Town Board, no final action by the Planning Board was taken. See Sokoloff Decl., Ex. MM; Pls' Exhibits, Volume III, Ex. N. The minutes also reflect that Mr. Fernandez, when queried as to the standard of reviewing and making a recommendation on an open development area, responded that "none was needed." Id. The Plaintiffs' application was again scheduled for discussion and consideration during the Planning Board's February 22, 2006, meeting.

Plaintiffs center much of their argument on the substance of Mr. Clouser's January 19, 2006, correspondence and the actions of the Planning Board thereafter. Plaintiffs claim that Defendant Fernandez directed the Plaintiffs to comply with certain requirements that were necessary for final plat approval as opposed to preliminary plat approval, see Pls' 56.1 Statement at ¶41, and that he also required the Plaintiffs to make clerical corrections to the EAF before it would be accepted, see Pls' 56.1 Statement at ¶¶42, 43. Plaintiffs maintain that such actions

were done out of malice and with the intent to derail the Plaintiffs' application purposefully.  Id.

After the Planning Board received Mr. Clouser's January 19, 2006, correspondence, and after it held its January 25, 2006, meeting, the Planning Board, at the urging of Mr. Clouser and the Town Board attorney, Mr. William Bogle, retained its own attorney to help review and finalize the Plaintiffs' application.  See Ferenandez 56.1 Statement at ¶74; Town 56.1 Statement at ¶39; Pls' 56.1 Statement at ¶45.  Plaintiffs argue, however, that the Planning Board's retention of its own attorney was done in an effort to delay the Plaintiffs' application further by having the attorney, Ms. Jennifer Van Tuyl, prepare additional memoranda and raise additional objections to the Plaintiffs' application.  See Pls' 56.1 Statement at ¶45.

Plaintiffs submitted a revised EAF to the Planning Board on February 1, 2006, see Fernandez 56.1 Statement at ¶75, which was reviewed by the Planning Board on February 22, 2006, see id. at ¶76.  The Planning Board "worked with the applicant . . . to complete the Long EAF[, which] . . . was given to the applicant to redo."  See Sokoloff Decl., Ex. QQ; Pls' Exhibits, Volume III, Ex. N.  Plaintiff George Osborne prepared a second revised EAF and submitted it to the Planning Board on March 7, 2006.  See Fernandez 56.1 Statement at ¶78.

Defendant Fernandez distributed a letter authored by Ms. Van Tuyl, dated March 29, 2006, to the other members of the Planning Board and to Plaintiff George Osborne on the night of the Planning Board's March 29, 2006, meeting.  See Fernandez 56.1 Statement at ¶79; Town 56.1 Statement at ¶42; Pls' 56.1 Statement at ¶46.  Ms. Van Tuyl provided comments on the Plaintiffs' EAF and remaining subdivision application materials.  See Sokoloff Decl., Ex. TT.  In her correspondence, Ms. Van Tuyl enumerated the standard the Planning Board had to comply with under the New York state environmental laws and regulations and identified several areas

of concern about the Plaintiffs' application materials.  Id.  Plaintiffs assert that this memorandum from Ms. Van Tuyl was used to "shut off all discussion" of the Plaintiffs' application at the March 2006 Planning Board meeting; Plaintiffs do not dispute, however, that they were instructed to review the memorandum and to provide a response to the Planning Board at the April 26, 2006, Planning Board meeting.  See Pls' 56.1 Statement at ¶46.

Plaintiffs prepared a revised EAF in response to some of the issues raised by Ms. Van Tuyl in her March 29, 2006, correspondence, dated April 13, 2006.  See Fernandez 56.1 Statement at ¶85; Pls' 56.1 Statement at ¶47.  Ms. Van Tuyl and Mr. Clouser reviewed Plaintiffs' April 13, 2006, EAF on April 21, 2006, and identified several discrete areas that prevented them from recommending to the Planning Board that approval the Plaintiffs' application should be granted and that a negative declaration should be issued.  See Sokoloff Decl., Ex. WW (correspondence of Mr. Clouser); id., Ex. XX (correspondence of Ms. Van Tuyl).  Ms. Van Tuyl prepared a lengthy memorandum outlining her remaining concerns with the Plaintiffs' efforts to correct and to comply with the recommendations she made previously to the Planning Board, see Sokoloff Decl., Ex. XX, and noted that in some instances she believed that the Plaintiffs failed to respond to the issues previously raised, id.

Both Ms. Van Tuyl's correspondence and Mr. Clouser's correspondence were distributed to the Plaintiffs at the April 26, 2006, Planning Board meeting.  See Fernandez 56.1 Statement at ¶94; Town 56.1 Statement at ¶48; Pls' 56.1 Statement at ¶47.  "Mr. Osborne voiced his absolute disagreement to the points brought up in this most recent memo."  See Sokoloff Dec., Ex. YY; Pls' Exhibits, Volume III, Ex. N.  "Heated disuss[ion] continued and Mr. Fernandez asked Mr. Osborne to review the memo and return to the May 31st meeting with a rebuttal in writing."  Id.

Plaintiffs also maintain that the Defendants, and Defendant Fernandez in particular, impeded their ability to work with the Planning Board during the application process by restricting the Plaintiffs' access to Ms. Van Tuyl and Mr. Clouser. See Pls' 56.1 Statement at ¶52. Plaintiffs allege that these restrictions included Defendant Fernandez's requirement that the Plaintiffs mail all correspondence directly to him and that the Plaintiffs refrain from contacting or speaking with Ms. Van Tuyl or Mr. Clouser outside of the Planning Board's meetings. Id. This course of conduct, according to the Plaintiffs, was the product of Defendant Fernandez's need to exercise complete and total control over the subdivision application process. See id.; see also Comp. at ¶¶2, 116-18.

At the commencement of the May 31, 2006, Planning Board meeting, Defendants Fernandez, Freehill, Fouts, and Angell were served with the Summons and Complaint filed in this litigation. See Fernandez 56.1 Statement at ¶95; Town 56.1 Statement at ¶49. Following commencement of this action, Defendant Fernandez was removed as Chairman of the Town of Stanford Planning Board but remained as a Planning Board Member. See Fernandez 56.1 Statement at ¶99. Following the commencement of this action, the Plaintiffs also continued working with the Planning Board in an effort to secure approval of their subdivision proposal. See Fernandez 56.1 Statement at ¶¶100, 102; Town 56.1 Statement at ¶52. Work on the Plaintiffs' subdivision application continued through the summer of 2006, and included the production of several additional memoranda from Ms. Van Tuyl and Mr. Clouser and the Plaintiffs' submission of another revised EAF. See Fernandez 56.1 Statement at ¶¶103-06; Town 56.1 Statement at ¶¶53-57.

On August 30, 2006, the Planning Board issued a negative declaration under SEQRA on

the Plaintiffs' proposed subdivision and granted the Plaintiffs preliminary plat approval with modifications. <u>See</u> Fernandez 56.1 Statement at ¶107; Town 56.1 Statement at ¶63; Pls' 56.1 Statement at ¶58. On September 29, 2006, the Town Board enacted an open development zone resolution for the Plaintiffs' proposed subdivision. <u>See</u> Fernandez 56.1 Statement at ¶108; Town 56.1 Statement at ¶64. As of the submission of the motion papers in this case, the Plaintiffs had not yet filed for final plat approval under the Stanford Town Code seeking final approval of their subdivision application. <u>See</u> Town 56.1 Statement at ¶66; <u>see also</u> Pls' Opp. to Town 56.1 Statement at ¶66 ("Plaintiff has not yet filed an application for final approval.").

D.       <u>Plaintiffs' Causes of Action</u>

Plaintiffs commenced this action against the Defendants on May 26, 2006, raising federal constitutional and state law claims. <u>See</u> Docket #1, Complaint. The crux of the Plaintiffs' Complaint is that the Defendants intentionally delayed Plaintiffs' application to subdivide their property and that such intentional delay and obfuscation amounted to willful bad faith conduct in violation of the federal constitution and state law. Plaintiffs maintain that they have been damaged in an amount not less than $10,000,000 as a result of the Defendants' actions. Plaintiffs' statement of damages includes their loss of the sale of the proposed subdivided lots – Plaintiffs claim that they had a prospective purchaser of the property who became disenfranchised after the subdivision process was delayed – their injuries resulting from violations of their federal constitutional and statutory rights, and their individual emotional pain and suffering.

Plaintiffs raise four constitutional claims against the Defendants under 42 U.S.C. §1983. Plaintiffs allege that the Defendants (1) violated their First Amendment rights by limiting their

contact and speech with the Planning Board's engineer and attorney; (2) violated their Fourteenth Amendment rights to procedural and substantive due process by "willfully and intentionally delaying Plaintiffs' application process for 21 months [and] by enactment and enforcement of procedural rules that are designed to create endless delays," see Comp. at ¶119, and (3) violated their Fourteenth Amendment rights to the equal protection of the laws by enforcing selectively portions of state and local law.  Plaintiffs also raise four supplemental state law claims, including (1) a claim for the breach of the duty of good faith and fair dealing; (2) a deceptive acts and practices claim in violation of N.Y. Gen. Bus. Law §349; (3) a claim for intentional, knowing, and malicious destruction of rights, property and future opportunity; and (4) a claim of intentional infliction of emotional distress.

Despite the Plaintiffs' enumerating five counts in their Complaint, Plaintiffs actually state eight individual causes of action.  See Comp. at ¶¶112-146.  Read literally, Plaintiffs' Complaint asserts the federal causes of action against Defendant Fernandez in Count One, see Comp. at ¶¶112-126 (entitled "First Court (sic) Against Defendant Gerardo Fernandez Deprivation of Civil Rights and Privileges in Violation of 24 U.S. Code § 1983 (sic)), and asserts the remaining state law claims against "all defendants" in Counts Two, Three, Four and Five,  see Comp at ¶¶127-146.  Counsel for the Town Defendants highlights this presentation of the Plaintiffs' claims and argues that the Court should not construe the Plaintiffs' pleading as asserting the federal causes of action against the Town Defendants.  See Town Mem. at pp. 2-3.  Counsel for the Town Defendants acknowledges, however, that the Plaintiffs' Complaint makes an earlier reference to some of the Plaintiffs' federal constitutional claims as being asserted against all of the Defendants, and that read broadly, the Complaint could be interpreted as raising certain

constitutional claims against all of the Defendants notwithstanding the express delineation of the claims offered by the Plaintiffs.  See id. at p. 3.

Although the undersigned agrees that the Plaintiffs' Complaint expressly asserts the federal constitutional claims against Defendant Fernandez only, I nevertheless conclude, and respectfully recommend that Your Honor should conclude, that the Plaintiffs' Complaint should be read as asserting each of the federal constitutional claims against each of the Defendants.  The Town Defendants have filed their motion for summary judgment seeking dismissal of each of the Plaintiffs' federal constitutional claims thus eliminating any possible prejudice that may arise against the Town Defendants by interpreting the Complaint against them in this manner.  Moreover, it does appear that the Plaintiffs' Complaint incorporates prior paragraphs by reference and specifies at the outset that facts asserted throughout the Complaint are "common to all counts."  See Comp. at p. 7.  I therefore conclude that the Plaintiffs' Complaint should be construed as asserting each of the federal and state law claims against each of the Defendants.

E.      Defendants' Motions for Summary Judgment and Plaintiffs' Opposition

        1.      Defendants' Argument in Support of Summary Judgment

Defendants raise several arguments in support of complete dismissal of the Plaintiffs' Complaint.  Both Defendant Fernandez and the Town Defendants argue that the Plaintiffs lack a cognizable constitutional property interest in obtaining permission to subdivide their land and argue in the alternative that the Plaintiffs should have first sought recourse in the state courts through an Article 78 proceeding rather than filing the instant federal civil rights litigation. Defendant Fernandez further suggests that the discretion afforded to the Planning Board negates the Plaintiffs' claim that they had an entitlement to subdivide their land and that such discretion

is fatal to §1983 due process claims.

Counsel for the Town Defendants also raises the jurisdictional question of whether the Plaintiffs' constitutional claims are ripe for judicial review.  <u>See</u> Town Defs' Mem. at p. 2. Counsel for the Town Defendants argues that in §1983 land-use cases a plaintiff must have obtained a final decision on his or her permit or application before he or she can file suit asserting an alleged constitutional violation.  The Town Defendants reason that the Plaintiffs' claims are not ripe for review because the Plaintiffs have not obtained a final decision from the Planning Board.  Counsel for Defendant Fernandez and the Town Defendants also challenge the evidentiary sufficiency of the Plaintiffs' equal protection claim and conclude their memoranda of law with arguments that the Defendants would be entitled to the protection of qualified immunity in the event that the Court concludes that any Defendant committed some form of constitutional error.

2.      Plaintiffs' Opposition

Plaintiffs suggest throughout their respective memoranda of law and response to the Defendants' 56.1 Statements that there are numerous factual issues that warrant presentation of the instant case to the jury.  Plaintiffs primarily argue that they obtained a vested property interest in receiving permission from the Planning Board to subdivide their land as a result of the delay and of the actions that the Planning Board required the Plaintiffs to undertake during the application process.  Plaintiffs assert that their reliance on the Planning Board's directives and requirements provide them with a vested interest in obtaining permission to subdivide their land and that the Defendants' collective actions give rise to procedural and substantive due process claims predicated upon this vested right to the granting of subdivision approval from the

Planning Board.

Plaintiffs also argue that they were treated differently than other subdivision applicants and that their experiences with the Planning Board were similar to the experiences of another subdivision applicant, thus bolstering their claim that the Planning Board exhibited open hostility toward applicants who sought approval to subdivide land in the Town of Stanford. Plaintiffs further reason that the Defendants are not entitled to qualified immunity and that they were under no obligation to seek recourse in an Article 78 proceeding in state court before commencing this action. Plaintiffs also argue that the Defendants have raised "numerous" additional arguments in support of their motions for summary judgment in their Reply Memoranda that were not contained in their moving papers. Plaintiffs identify such new arguments as including the ripeness argument reviewed above and an argument advanced by Defendant Fernandez that he is entitled to absolute legislative immunity.

F.     Summary of Recommendations

In light of the dense factual nature of this dispute and the volume of legal memoranda and exhibits submitted to the Court for consideration in connection with the instant motions, the undersigned offers the following summary of the conclusions and recommendations made to Your Honor.

First, I respectfully recommend that the Plaintiffs' §1983 due process and equal protection claims are not ripe for judicial review. Second, I respectfully recommend that the Plaintiffs have also not established a cognizable property interest supplying the necessary basis for either of their due process claims and also have failed to establish a genuine issue of material fact on their selective enforcement equal protection claim. Third, I respectfully recommend that

the Plaintiffs' First Amendment claims are without merit as a matter of law and should be dismissed. Finally, in light of the aforementioned recommendations, I respectfully recommend that the Court should decline to exercise supplemental jurisdiction over the Plaintiffs' supplemental state law claims under 28 U.S.C. §1367.

## **DISCUSSION**

A. <u>Summary Judgment Standard and Local Rule 56.1</u>

     1.      Summary Judgement Standard

Pursuant to the Federal Rules of Civil Procedure, summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 320-23 (1986). A fact is "material" when it may affect the outcome of a case under the governing substantive law. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. <u>Id.</u> A trial judge may, therefore, grant summary judgment only if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law. <u>Id.</u> at 250. The inquiry performed is the threshold inquiry of determining whether there are any genuine factual issues that properly can be resolved only by a finder of fact. <u>Id.</u>

Summary judgment may be granted only "[i]f after discovery, the nonmoving party 'has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof.' " <u>Berger v. United States</u>, 87 F.3d 60, 65 (2d Cir. 1996) (quoting <u>Celotex</u>, 477 U.S. at 323) (alteration in original). "The nonmoving party must have 'had the

opportunity to discover information that is essential to his [or her] opposition' to the motion for summary judgment." Trebor Sportswear Co. v. The Limited Stores, Inc., 865 F.2d 506, 511 (2d Cir. 1989) (quoting Anderson, 477 U.S. at 250 n. 5). Moreover, a court should "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences in its favor." Mount Vernon Fire Ins. Co., 277 F.3d at 236; Farias v. Instructional Sys., Inc., 259 F.3d 91, 97 (2d Cir. 2001); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 764 (2d Cir. 1998); see also Anderson, 477 U.S. at 261 n.2. Thus, "[o]nly when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted." Cruden v. Bank of New York, 957 F.2d 961, 975 (2d Cir. 1992) (quoting H.L. Hayden Co. of New York, Inc. v. Siemans Med. Sys. Inc., 879 F.2d 1005, 1011 (2d Cir. 1989)).

      2.      Local Rule 56.1

Pursuant to the Local Rules for the Southern and Eastern Districts of New York, a moving party must attach a "separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." See Local Rule 56.1(a). A similar requirement is imposed upon the party opposing the motion for summary judgment. See Local Rule 56.1(b) (requiring the party opposing a motion for summary judgment to identify the material facts which it contends are in dispute). Should the non-moving party fail to respond to the facts alleged by the moving party to be undisputed, those facts "will be deemed to be admitted for purposes of the motion . . . ." Local Rule 56.1(c). Importantly, "[e]ach statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil

Procedure 56(e)."  See Local Rule 56.1(d).  This requirement "free[s] district courts from the need to hunt through voluminous records without guidance from the parties."  Holtz v. Rockefeller and Co., 258 F.3d 62, 74 (2d Cir. 2001) (citations omitted).

Thus, as a general rule, the Court may accept as true the material facts asserted by the moving party in an unopposed Rule 56.1 statement.  See Gubitosi v. Kapica, 154 F.3d 30, 31 n.2 (2d Cir. 1998).  The Second Circuit has cautioned, however, that the opposing party's failure to comply with the local rules does not absolve the moving party from meeting its own burden of proof in its motion for summary judgment.  See Holtz, 258 F.3d at 72-74.  The Holtz court also noted that a district court has "broad discretion" to determine whether to overlook noncompliance with the local rules.  Id. at 73.  Synthesizing the spirit of the Local Rules, and the Holtz court's decision, failure to respond to a moving party's Rule 56.1 Statement may mean that the uncontested facts contained therein will be assumed to be true for the purposes of the motion if such facts are properly supported by citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003).

B.      Ripeness of Plaintiffs' §1983 Due Process and Equal Protection Claims

1.      Nature of Ripeness Inquiry

One of the constitutional minima a plaintiff must satisfy in order to bring a valid lawsuit in federal court is that his or her claim for relief is ripe for judicial review.  See Murphy v. New Milford Zoning Comm'n, 402 F.3d 342, 347 (2d Cir. 2005).  A court's ripeness inquiry focuses on whether a particular claim, rather than a particular lawsuit, is developed sufficiently such that the claim is proper for adjudication.  Id.  The constitutional concerns pertaining to ripeness emanate from the "case or controversy" requirement of Article III of the U.S. Constitution and

from the prudential limitations that exists on federal court jurisdiction.  Id. (citing Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725, 733 n.7 (1997)).  The ripeness requirement mandated by the Constitution cannot be waived by the parties because of its centrality to the question of jurisdiction; ripeness, as an element of a court's jurisdiction, may be raised and addressed by the Court on its own initiative.  See Reno v. Catholic Soc. Servs., 509 U.S. 43, 57 n.18 (1993) ("Even when a ripeness question in a particular case is prudential, we may raise it on our own motion and 'cannot be bound by the wishes of the parties.' ") (quotation omitted)).[5]

Ripeness of a particular claim for review is an inherently fact-based inquiry.  See Murphy, 402 F.3d at 350.  The inherent factual nature of the ripeness inquiry, however, does not remove consideration of a claim's ripeness from a court on a motion for summary judgment.  Id. The Court must review and discern whether the plaintiff has submitted "clear, complete, and unambiguous" facts evincing his or her entitlement to present the claim in Court.  Id. (quoting Hoehne v. County of San Benito, 870 F.2d 529, 533 (9th Cir. 1989)).  Should a Court determine that a claim is not ripe for review, a complainant may be eligible to bring such a claim in court once the claim becomes ripe.  Id. at 347.  A plaintiff's ability to re-assert a claim once it becomes ripe reflects the fact that ripeness is question of timing that is designed to ensure that a claim is placed before a court at the proper point in time for adjudication.  Id. (quoting Abbot Labs. v. Gardner, 387 U.S. 136, 148 (1967) (ripeness doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract

_____

[5]  It is for this reason that the Plaintiffs' assertion in their sur-reply memoranda that the Defendants failed to raise the issue of ripeness in a timely fashion is without merit and may be considered by the Court.  Moreover, as explained above, the Town Defendants included a ripeness argument in their initial moving papers.  See supra at p. 35; see also Town Mem. at p. 2.

disagreements.")).

  2.  Ripeness Inquiry in Land Use Claims

  "[T]he Supreme Court has developed specific ripeness requirements applicable to land use disputes." <u>Id.</u>  The Supreme Court established a two part ripeness inquiry governing the majority of land-use disputes brought as constitutional claims in <u>Williamson Co. Reg'l Planning Comm'n v. Hamilton Bank</u>, 473 U.S. 172 (1985).  The first prong of the <u>Williamson</u> ripeness test analyzes whether "the government entity charged with enforcing the regulations at issue . . . [has] rendered a final decision," and the second <u>Williamson</u> ripeness prong considers whether "the plaintiff . . . [has] sought compensation if the state provides a 'reasonable, certain and adequate provision for obtaining compensation.' " <u>Southview Assocs. v. Bongartz</u>, 980 F.2d 84, 95 (2d Cir. 1992) (quoting <u>Williamson</u>, 473 U.S. at 186, 194).  The two prong <u>Williamson</u> ripeness inquiry has been employed in land-use challenges brought under the due process clause and the equal protection clause.  <u>Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals</u>, 282 F.3d 83, 88-89 (2d Cir. 2002); <u>R-Goshen LLC v. Andrews</u>, 115 Fed. Appx. 465, 466-67 (2d Cir. 2004).

  The Second Circuit, however, has held that there exists an exception to the two prong <u>Williamson</u> ripeness inquiry for constitutional land-use claims that do not sound in a Fifth Amendment takings theory.  <u>See</u> <u>Southview Assocs.</u>, 980 F.2d at 97.  Constitutional land-use claims that challenge the actions of the government under the arbitrary and capricious substantive due process standard do not have to satisfy the second <u>Williamson</u> prong analyzing whether the plaintiff sought compensation from the state.  <u>Id.</u>  The Second Circuit reasoned in <u>Southview</u> that the second prong of the <u>Williamson</u> ripeness analysis is derived from the

compensation element of the Takings Clause of the Fifth Amendment and held that a federal litigant does not have to attempt to present a claim challenging the propriety of a government actor's actions in state court when the gravamen of such a claim does not rest on a taking's theory.  Id.; see also Dougherty, 282 F.3d at 90.  Thus, under controlling Second Circuit authority, a plaintiff bringing a land-use substantive due process claim against a defendant challenging his or her conduct under the arbitrary and capricious standard need only satisfy the first Williamson ripeness prong analyzing whether the defendant has rendered a final decision. Dougherty, 282 F.3d at 88-89; Southview Assocs., 980 F.2d at 97.

Although the Second Circuit had strongly suggested that the final decision prong of the Williamson ripeness analysis was required for all species of land-use claims, whether brought as substantive due process claims, procedural due process claims, or equal protection claims, see R-Goshen, 115 Fed. Appx. at 466-67, the Second Circuit offered in recent *dicta* that Williamson's prong one ripeness analysis may not be required for land-use challenges predicated upon an "immediately sustained and concretely felt" injury arising in the absence of a final decision.  See Adrian v. Town of Yorktown, 210 Fed. Appx. 131, 133 n.2 (2d Cir. 2006) (internal quotations omitted).  In Adrian, the Second Circuit theorized that a procedural due process or equal protection claim seeking damages based upon an alleged infirmity with the process employed by the defendant that gives rise to a discrete constitutional injury may be exempt from Williamson's final decision ripeness requirement.  Id.  The Adrian panel noted that the Second Circuit has previously recognized such an exception for a First Amendment retaliation claim arising in the land-use context when the injury alleged was immediate and did not otherwise raise a question about "administrative finality."  See Adrian, 210 Fed. Appx. at 133 n. 2 (citing Dougherty, 282

F.3d at 88-89).  Expounding upon <u>Dougherty</u>, the <u>Adrian</u> panel offered that a plaintiff asserting a land-use claim based upon an immediate injury involving the process used by a defendant may not have to wait for the defendant to render a final decision in order to present his or her claim in federal court.  <u>Id.</u>

Subsequent to the <u>Adrian</u> panel's invitation to the District Court to explore this issue, the District Court concluded that the claims raised by the plaintiffs in that case were akin to takings-type claims and held that the plaintiffs remained obligated to satisfy <u>Williamson</u>'s final decision ripeness analysis.  <u>See</u> <u>Adrian v. Town of Yorktown</u>, 03 Civ. 6604 (MDF), 2007 WL 1467417, at *6 (S.D.N.Y. May 16, 2007) ("the injury alleged by the Plaintiffs – the loss of the development value of their property – places their equal protection and procedural due process claims within the takings realm.").  It does not appear that any other reported decision after the Second Circuit's <u>Adrian</u> decision addresses this issue.  It thus appears an open question in this Circuit whether an exception to <u>Williamson</u>'s final decision ripeness prong exists for procedural due process and equal protection claims that allege an immediate injury and that are not predicated upon a Fifth Amendment takings theory.

The <u>Adrian</u> panel's *dicta* does not make clear how this possible exception to <u>Williamson</u>'s final decision ripeness requirement for procedural due process and equal protection claims would comport with its decision in <u>Southview</u> that mandates that substantive due process claims of the same nature must satisfy <u>Williamson</u>'s final decision requirement.  <u>See</u> <u>Southview Assocs.</u>, 980 F.2d at 96-97.  Dividing non-takings land-use claims into two categories subject to distinct ripeness analyses does not appear advantageous in light of the fact that each of these claims raises a similarly styled challenge to the propriety of the actions of a municipal

entity during the pendency of an administrative proceeding.  I respectfully conclude that the Adrian panel's *dicta* cannot be reconciled with the holding of Southview Associates because such *dicta* calls into question the underlying holding in Southview Associates that Williamson's prong one ripeness analysis applies to non-takings land-use challenges.

The Adrian panel majority's theory regarding a possible alternative ripeness analysis based upon its decision in Dougherty rests heavily on the fact that the claim in Dougherty was a retaliation claim based upon the defendant revoking a permit that had been previously issued to the plaintiff after the plaintiff served opposition papers on the Town in connection with ongoing federal litigation.  See Dougherty, 282 F.3d at 87.  The Second Circuit reasoned that under those circumstances the plaintiff did not have to wait to receive a final decision from the Town because the injury asserted by the Plaintiff in that case occurred at the moment the Defendant revoked the permit; under the facts of that case, further administrative proceedings were ancillary to the plaintiff establishing his claim for relief.  See Murphy, 402 F.3d at 351 (explaining the Dougherty analysis as considering "(1) whether the [plaintiff] experienced an immediate injury . . . and (2) whether requiring the [plaintiff] to pursue additional administrative remedies would further define [the] alleged injuries."); see also Dougherty, 282 F.3d at 91 ("Dougherty suffered an injury at the moment the defendants revoked his permit . . .").

In contrast to this claim of an immediate injury the Circuit determined to be actionable in Dougherty, the claims of substantive due process, procedural due process, and equal protection advanced by the Plaintiffs in this case are based upon an alleged defect in the process the Defendants used when considering the Plaintiffs' land use application.  Such claims do not articulate an immediate injury that exist independent of the final decision made by the municipal

agency. In the retaliation context, a claim ripens once the retaliatory action is taken, <u>see</u> <u>Dougherty</u>, 282 F.3d at 91; in a non-retaliation context, a claim ripens only when a final decision is made, <u>see</u> <u>Southview Assocs.</u>, 980 F.2d at 97. Acknowledging that constitutional injury may arise prior to a final decision in a non-retaliation cause of action implies that a plaintiff has a right to the expeditious processing and approval of his or her application.[6] Creating such a ripeness rule would breathe life into a new line of constitutional land-use claims that has yet to be recognized by the Second Circuit or by the Supreme Court.

Accordingly, because <u>Southview Assocs.</u> directs that non-takings land-use claims must satisfy the final decision prong of the <u>Williamson</u> ripeness analysis, and because subsequent Second Circuit authority implies that this ripeness analysis is applicable to other non-retaliation due process and equal protection claims, <u>see</u> <u>Dougherty</u>, 282 F.3d at 88-89; <u>R-Goshen</u>, 115 Fed. Appx. at 466-67, I conclude, and respectfully recommend that Your Honor should conclude, that the Plaintiffs' non-retaliation due process and equal protection land-use claims are subject to <u>Williamson</u>'s prong one finality ripeness analysis. I respectfully recommend that the <u>Dougherty</u> exception to <u>Williamson</u>'s prong one ripeness analysis is inapplicable to due process and equal protection land-use challenges that do not assert claims of retaliation and that the Plaintiffs must satisfy this prong of <u>Williamson</u> in order to assert justiciable claims in this case.

3.      Ripeness of Plaintiffs' Due Process and Equal Protection Violations

Upon review of the facts informing the Plaintiffs' due process and equal protection land-use claims, I conclude, and respectfully recommend that Your Honor should conclude, that the

---

[6] As discussed below, the Plaintiffs enjoy no such right under the facts and governing local and state law involved in this case.

Plaintiffs' claims are not ripe for review because of the absence of a final decision on the

Plaintiffs' subdivision application. It is undisputed that the Defendants did not reach a final

decision on the Plaintiffs' permit application at the time the Plaintiffs commenced this action and

it is further undisputed that their application remained pending before the Planning Board at the

time the Plaintiffs' commenced suit. See Town Defs' 56.1 Statement at ¶63 (noting that

preliminary application approval was granted by the Planning Board on August 30, 2006); Pls'

Opp. to Town 56.1 Statement at ¶63 ("There is no issue here."). Under the facts and legal

theories of this case, in which the Plaintiffs are not advancing a retaliation claim against the

Defendants and in which the Defendants have not reached a final decision on the Plaintiffs'

application, I conclude that the Plaintiffs claims are not ripe constitutional claims that can be

presented to the Court for redress. See Southview Assocs., 980 F.2d at 96-97; Dougherty, 282

F.3d at 88-89 (citing Southview Assocs., 980 F.2d at 96-97). Under the facts of this case, the

Plaintiffs' claims can only be considered ripe when the Defendants render a final decision, which

would then give the Plaintiffs the opportunity to argue that the Defendants' final decision was

the product of arbitrary and capricious conduct, was violative of procedural due process, or ran

afoul of the equal protection clause. Contrary to Dougherty, further administrative proceedings

in this case could perfect and implicate the issues presented in the Plaintiffs' Complaint; in fact,

further proceedings could render the Plaintiffs' claims moot if the Defendants grant the

Plaintiffs' final subdivision approval.

Subsequent to Plaintiffs commencing this suit, the Planning Board approved Plaintiffs'

preliminary subdivision application on August 30, 2006. See Town 56.1 Statement at ¶63.

Under the Town Code, following this occurrence, the Plaintiffs had one hundred and eighty days

46

to file their final plat subdivision application with the Planning Board.  See Town Code §140-9(A)(2).  Plaintiffs neither dispute that they took no such action nor dispute that more than one hundred and eighty days have elapsed since they were granted preliminary plat approval on August 30, 2006.  See Town Defs' 56.1 Statement at ¶66 ("To date, plaintiffs have not filed an application for final approval."); Pls' Opp. to Town 56.1 Statement at ¶66 ("Plaintiff has not yet filed an application for final approval.").  This course of action reinforces the undersigned's recommendation that the Plaintiffs' claims of constitutional injury are not ripe for review absent a final decision by the Defendants in light of the fact that the Plaintiffs have delayed the Defendants' rendering a final decision.  See N.Y. Town Law §276(5)(h) ("Within six months of the approval of the preliminary plat the owner must submit the plat in final form.  If the plat is not submitted within six months, approval of the preliminary plat may be revoked by the planning board."); Town Code §140-9(A)(2); Aloya v. Planning Bd., 241 A.D.2d 73, 75 (2d Dep't 1998), aff'd 93 N.Y.2d 334 (1999) (commenting that under N.Y. Town Law §276(5)(h), "the burden is on the developer to take affirmative action to submit a final plat for approval, otherwise the planning board has the option to revoke preliminary approval . . .").

Accordingly, under current binding Second Circuit case law, I conclude, and respectfully recommend that Your Honor should conclude, that the Plaintiffs' substantive due process, procedural due process and equal protection claims, each of which do not rest upon a Fifth Amendment takings theory,[7] and each of which do not articulate retaliation claims, are not ripe

_____

[7]  In the course of his submissions to the Court Mr. Osborne explicitly states that the claims raised in this suit do not rest upon the takings clause of the Fifth Amendment.  See Plaintiffs' Sur-Reply Memorandum to Town Defendants' Motion for Summary Judgment at pp. 11-13 (arguing that the Plaintiffs do not advance a takings theory and that such cases are inapplicable to the legal issues raised in this case).

for review because of the absence of a final decision by the Planning Board. I therefore conclude, and respectfully recommend that Your Honor should conclude, that the Court lacks jurisdiction over these claims and that they should be dismissed from this case as non-justiciable claims.

C.      Additional Analysis of Plaintiffs' Due Process and Equal Protection Claims

I additionally conclude, and respectfully recommend that Your Honor should conclude, that even if the Plaintiff's claims are ripe, then the Plaintiffs still cannot establish that they have a cognizable property interest in their subdivision application and that absence of such a constitutionally protected interest bars the Plaintiffs from asserting their due process claims against the Defendants. I also conclude, and respectfully recommend, that the Plaintiffs cannot establish a genuine issue of material fact on this claim and that the Defendants' motion for summary judgment seeking dismissal of this claim should be granted.

1.      Plaintiffs' Substantive Due Process and Procedural Due Process Claims

a.      Cognizable Property Interest

Plaintiffs may only assert their substantive and procedural due process claims if they first establish that they have a cognizable property interest that qualifies for protection under the Due Process Clause of the Fourteenth Amendment. See Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 784 (2d Cir. 2007); Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999). A plaintiff can have a constitutionally recognized property interest either in the property he or she actual owns or in something he or she seeks to own or to acquire. See DLC Mgmt. Corp., v. Town of Hyde Park, 163 F.3d 124, 129, 132 (2d Cir. 1998); Zahra v. Town of Southold, 48 F.3d 674, 680 (2d Cir. 1995). The burden is on the plaintiff to establish his or her colorable property

interest as a condition precedent to bringing a due process claim under 42 U.S.C. §1983 and the

Fourteenth Amendment.  See Clubside, Inc. v. Valentin, 468 F.3d 144, 152 (2d Cir. 2006).  The

existence of a constitutional property interest is a question of law for the Court to resolve.  See

Natale, 170 F.3d at 263.

When a complainant bases a due process claim upon a property interest in something that

he or she seeks to own or acquire the complainant bears the burden of establishing an entitlement

to the object he or she seeks.  Cine SK8, 507 F.3d at 784.  In this case, where the Plaintiffs

predicate their due process claims upon their application to subdivide their land, the Plaintiffs

must establish their entitlement to the issuance of permit from the Planning Board.  Id.  "The

Second Circuit uses a 'strict entitlement test to determine whether a party's interest in a land-use

regulation is protectible under the Fourteenth Amendment.' "  Id. (quoting Zahra, 48 F.3d at

680).  The strict entitlement test for determining whether there exists a colorable property

interest evolves out of the requirement that a party must have more than an "abstract need or

desire for, or unilateral expectation of the claimed right."  DLC Mgmt. Corp., 163 F.3d at 130

(citing Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)).  Cognizable due

process interests may arise from two sources: from the Due Process Clause itself or from positive

state law.  See Kentucky Dep't of Corrs., et al., v. Thompson, 490 U.S. 454, 460 (1989).

"Because the U.S. Constitution generally does not create property interests, this court, in

applying the entitlement test, looks to 'existing rules or understandings that stem from an

independent source such as state law to determine whether a claimed property right rises to the

level of a right entitled to protection under the substantive due process doctrine.' "  Cine SK8,

507 F.3d at 784; see also Gagliardi v. Vill. of Pawling, 18 F.3d 188, 192 (2d Cir. 1994)

(applying the entitlement test analysis to a plaintiff's claims of substantive and procedural due process).

At this juncture it is important to emphasize that there exist two types of due process challenges involving the issuance of land-use permits that each employs its own discrete legal analysis. The first class of due process challenges involves cases where a plaintiff asserts a "due process right to the existing zoning of [his or her] land." DLC Mgmt. Corp., 163 F.3d at 129-30; see also Cine SK8, 507 F.3d at 784 (discussing cases involving "a local government's revocation of a land-use benefit that the plaintiffs had previously been granted."). Such claims of a due process entitlement to preexisting zoning classifications usually arise when a plaintiff purchases a parcel of land or undertakes improvements to land in reliance upon a preexisting zoning classification that is changed to a more restrictive classification. DLC Mgmt. Corp., 163 F.3d at 129-30. The second class of due process challenges involves a plaintiff's claim of a due process right to the issuance of a permit from a local municipal authority under the current zoning laws. Id. at 132; see also Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 504 (2d Cir. 2001). Due process challenges of this kind emerge from a plaintiff seeking permission from a municipal entity to build upon or modify his or her land.

Cases involving the former category of land-use due process disputes – asserted entitlements to preexisting zoning classifications – are analyzed under the vested rights theory. See Cine SK8, 507 F.3d at 784-85; DLC Mgmt., 163 F.3d at 130. Under New York law a property owner obtains a vested right in a preexisting zoning status when the owner undertakes "substantial construction and [] ha[s] made substantial expenditures prior to the enactment of the more restrictive zoning ordinance." DLC Mgmt., 163 F.3d at 130. New York law also

50

recognizes that a property owner may obtain a due process right to a preexisting zoning classification by equitable estoppel in situations where municipal officials intentionally delay granting the owner permission to build on the land while simultaneously undertaking efforts to change the zoning classification of that land. Id. at 130-31. In these cases plaintiffs can attempt to establish colorable property interests in the preexisting zoning status of their land by arguing that their reliance on the preexisting zoning of the property induced them to purchase the property or to begin work on the property. See Cine SK8, 507 F.3d at 784 ("In New York, a vested right can be acquired when, pursuant to a legally issued permit, the landowner demonstrates a commitment to the purpose for which the permit was granted by effecting substantial changes and incurring substantial expenses to further the development.") (citing New York authority).

The instant matter, however, is of the latter class of due process claims – the class of due process challenges where plaintiffs advance a due process right to the issuance of a permit or to the receipt of approval from the local zoning authority. This species of due process claim does not invoke the vested rights or equitable estoppel doctrines explicated above; this type of due process claim considers whether the plaintiff-applicant enjoys an entitlement to the issuance of the permit he or she seeks. See Harlen Assocs., 273 F.3d at 504; DLC Mgmt., 163 F.3d at 132. Whether an applicant enjoys a due process right to the issuance of a zoning permit in these types of cases "turns on whether the issuing authority lacks discretion to deny the permit, i.e., is required to issue it upon ascertainment that certain objectively ascertainable criteria have been met." Harlen Assocs., 273 F.3d at 504 (quoting Natale, 170 F.3d at 263). The quantum of discretion a local zoning authority has to approve or reject a request for a permit is almost

51

always dispositive of such due process claims. A plaintiff may only assert this type of due process claim to the entitlement of the issuance of a discretionary permit when the discretion of the approving agency is so constricted that "there is either a certainty or a very strong likelihood that the application would have been granted." Yale Auto Parts v. Johnson, 758 F.2d 54, 59 (2d Cir. 1985).

This divergence between the types of due process claims and the legal tests employed by the courts in considering such claims explains the contrast between the arguments offered by the Defendants and Plaintiffs. Plaintiffs' primary theory in Opposition to the Defendants' summary judgment motions is that they acquired a vested property right in the issuance of the permit from the Planning Board to subdivide their land "as a consequence of the substantial construction expenses [] incurred as directed and required by the Defendant Planning Board members." See Pls' Opp. at p. 12. Plaintiffs surmise that their "right to Planning Board approval vested . . . in the same manner and for the same legal reason as a property owner's zoning status may vest." See id. at p. 29. In contrast, Defendants emphasize the degree of discretion extended to the Planning Board under the Town Code and argue that this discretion negates any claim that the Plaintiffs were entitled to subdivide their land as a matter of right. See Fernandez Mem. at pp. 3-12; Town Mem. at pp. 3-6.

After considering these distinct lines of reasoning, it appears to the undersigned that the Plaintiffs have attempted to combine these analyses into one hybrid standard applicable to all land-use due process challenges. Plaintiffs, however, do not offer any case law to support this transmogrification of the two distinct due process standards into one omnibus standard. Plaintiffs' conflation of the two types of due process claims and the employment of this new

hybrid legal standard supporting their claim that they obtained a vested right to the issuance of a discretionary permit finds no support in the standards utilized by the New York courts or the Courts of this Circuit when evaluating the species of due process claim asserted by the Plaintiffs. The vested rights theory central to Plaintiffs' Opposition applies only to due process challenges asserting an entitlement to an existing zoning status; it is undisputed that this type of claim is not at issue in this case. See Cine SK8, 507 F.3d at 784 ("Under New York law, a property owner has no right to an *existing land-use benefit* unless that right has 'vested.' "); DLC Mgmt., 163 F.3d at 130 ("Under New York law, a property owner has no right to the *existing zoning status* of his [or her] land unless his [or her] right have become 'vested.' "). Plaintiffs cannot avoid New York case law addressing claims of a putative right to the issuance of a permit by substituting and applying the legal standard used for claims to an entitlement to an existing zoning status.

The unmistakable gravamen of the Plaintiff's Complaint is that the Planning Board delayed reviewing and issuing the Plaintiffs' application for permission to subdivide their land. The cases relied upon by Plaintiffs, and the arguments they distill from these cases, in support of their vested rights theory are inapposite to the facts and issues presented in this case.

b.      Plaintiffs' Lack of Entitlement to Receipt of Subdivision Approval

Plaintiffs must establish they have a cognizable property interest in receiving approval to subdivide their land from the Planning Board by demonstrating that the Planning Board "lacked the authority to deny the permit" or by demonstrating that the Planning Board's "approval of a proper application was virtually assured." DLC Mgmt., 163 F.3d at 132; see also Harlen Assocs., 273 F.3d at 504. Whether the Plaintiffs enjoyed such a right involves reviewing the actions of the Planning Board and the Plaintiffs under the Stanford Town Code, N.Y. Town Law

and SEQRA.  The Plaintiffs may be able to establish a colorable property interest in the issuance of the permit from the Planning Board if they can establish that the default approval provisions of the Stanford Town Code and N.Y. Town Law were triggered and that they were guaranteed the issuance of their permit as a matter of right.  The Plaintiffs may also be able to establish an entitlement to the receipt of the permit from the Planning Board if they can demonstrate that the approval of their permit was virtually assured under the provisions of the Town Code and N.Y. Town Law.  See Natale, 170 F.3d at 263 n.1 ("in order to establish a federally protectable property interest in a state of local permit for which a plaintiff has applied, the plaintiff must show that . . . there was no uncertainty regarding his [or her] entitlement to it under applicable state or local law, and that the issuing authority had no discretion to withhold it in his [or her] particular case.").

For the following reasons, however, I conclude, and respectfully recommend that Your Honor should conclude, that the Plaintiffs cannot satisfy either of these showings and that their substantive due process and procedural due process claims should therefore be dismissed.

          i.      Default Approval under N.Y. Town Law and Stanford Town Code Not Triggered

Plaintiffs' application to subdivide their property is governed by Chapter 140 of the Stanford Town Code and several New York statutes.  Each body of law contains several mandatory timing provisions that require the Planning Board to take action on an applicant's request to subdivide his or her land.  Only two of the provisions of the N.Y. Town Law and the Stanford Town Code that are germane to this action mandate default approval of an applicant's request to subdivide his or her land in the event that the Planning Board does not take action within a certain period of time.  See N.Y. Town Law §276(8) (statutory default approval

54

procedure); Town Code §140-8 (approval of preliminary plat for major subdivision); §140-9 (approval of final plat for major subdivision).  Section 140-8(F) mandates that the Planning Board must hold a public hearing on a proposed major subdivision within forty-five days of its receipt of a complete preliminary plat application from an applicant and that the Planning Board "shall act by resolution on the preliminary plat" within forty-five days of the public hearing.  See Town Code §140-8(F)(1), (3).  Should the Planning Board not act within this latter forty-five day window, the Planning Board's failure to act "shall be deemed approval of the preliminary plat in accordance with the provisions of § 276 of the Town Law."  Id.  Town Code §140-9, which governs the approval process of a final plat for a major subdivision, contains similar timing and default approval provisions.  See Town Code §140-9(D)(2) (providing for default approval of a final plat if the Planning Board does not act upon a final plat within forty-five days of a public hearing on the final plat or act within forty-five days of receipt of final plat if no hearing is held).

These Stanford Town Code provisions parallel the provisions of the N.Y. Town Law that establish slightly larger windows of time within which a planning board must act upon a preliminary plat application and final plat application.  See N.Y. Town Law §276(5) (outlining approval process for preliminary plat); N.Y. Town Law §276(6) (outlining approval process for final plat).  The Town Code provisions also mirror the default approval process contained within the N.Y. Town Law.  Under N.Y. Town Law §276(8), "[i]n the event a planning board fails to take action on a preliminary plat or final plat within the time prescribed therefor after completion of all requirements under the state environmental quality review act . . . such preliminary or final plat approval shall be deemed granted approval."

As explained above, under both the Town Code and the N.Y. Town Law, the Planning

Board must act upon an applicant's request to subdivide land once the applicant submits a "complete preliminary plat."  See Town Code §140-8(F); N.Y. Town Law §276(5)(c), (d). Although the Town Code does not define the term "complete preliminary plat," the N.Y. Town Law defines a preliminary plat as being complete upon either (1) a lead agency filing a negative declaration affirming that the proposed action will not have an adverse impact on the environment or (2) a lead agency issuing a notice of completion of a draft environmental impact statement in accordance with SEQRA.  See N.Y. Town Law §276(5)(c).  This statutory section makes explicitly clear that "[t]he time periods for review of a preliminary plat shall begin upon filing of such negative declaration or such notice of completion."  Id.

It is undisputed in this case that the Plaintiffs did not receive a negative declaration from the Planning Board until August 30, 2006, three months after Plaintiffs commenced the instant suit.  Plaintiffs' preliminary plat application, therefore, never attained the status of a complete preliminary application under N.Y. Town Law prior to the commencement of this suit.  See Town Defs' 56.1 Statement at ¶63; see also N.Y. Town Law §276(5)(c).  Plaintiffs argue that the Planning Board prevented them from completing their preliminary plat application – and thus prevented the commencement of the Town Code and N.Y. Town Law default approval process – by requiring them to satisfy a continuous stream of haphazard requirements without advance notice.  See Osborne Opp. at pp. 33-51.

Plaintiffs' assertions of undue delay and intentional misleading during the environmental assessment portion of the preliminary plat application process, however, do not supply a valid ground upon which the Plaintiffs can base their claims of an entitlement to the default issuance of their requested subdivision permit.  New York case law makes clear that an applicant does not

have the right to the timely or expeditious completion of the SEQRA environmental review process. See Tinker St. Cinema v. Town of Woodstock Planning Bd., 256 A.D.2d 970, 972 (3d Dep't 1998) (citing Seaboard Contr. & Material v. Dep't of Envtl. Conservation, 132 A.D.2d 105 (3d Dep't 1987) ("an agency's failure to make a timely declaration of environmental significance does not result in a de facto negative declaration.")). The rationale behind this construction of SEQRA's provisions makes eminent sense when considered in conjunction with the purpose of SEQRA, which is to ensure that proposed land development does not adversely impact the environment. See, e.g., East End Property v. Kessel, 46 A.D.3d 817, 820-21 (2d Dep't 2007); Citizens Against Sprawl-Mart v. Planning Bd., 8 A.D.3d 1052, 1053 (4th Dep't 2004). "The overriding purpose of SEQRA is to assure that the decision maker has considered pertinent environmental information before making a decision." Tinker St. Cinema, 256 A.D.2d at 972. It would be anomalous to hold that an agency's failure to complete an environmental review in a timely manner should result in a default finding that the environment would not be impacted by the proposed project. Id.; see also Sun Beach Real Estate Dev. Corp. v. Anderson, 98 A.D.2d 367, 375-76 (2d Dep't 1983) ("We have no difficulty in according priority to SEQRA because the legislative declaration of purpose in that statute makes it obvious that protection of 'the environment for the use and enjoyment of this and all future generations' far overshadows the rights of developers to obtain prompt action on their proposals.").[8]

Decisions of the Appellate Division consistently confirm that SEQRA deadlines are

---

[8] The Second Department's Sun Beach decision preceded the 1995 amendment to N.Y. Town Law §276(8) that made it explicit that N.Y. Town Law's default provisions would not be triggered until "completion of all requirements under the state environmental quality review act" were satisfied. See Terry Rice, Practice Commentaries, 61 McKinney's Consol. Laws of N.Y. §276 (2004) (explaining legislative history of §276).

hortatory, not mandatory, and do not trigger substantive penalties if they are not followed.  See

Nicklin-McKay v. Town of Marlborough Planning Bd., 14 A.D.3d 858, 861 (3d Dep't 2005)

(explaining SEQRA time deadlines are "directory only," and do not establish mandatory

deadlines within which an agency must complete SEQRA review); Omabuild USA No. 1 v.

State, 207 A.D.2d 335 (2d Dep't 1994) (same).  The Planning Board's prolonged review of the

Plaintiffs' application, even if violative of some of the SEQRA time limits outlined in the

N.Y.C.R.R., does not vitiate the need to comply with SEQRA, does not result in a default

complete preliminary plat, and does not trigger the default approval provisions of N.Y. Town

Law §276(8) or the Town Code.  See Benison Corp. v. Davis, 2008 N.Y. Slip Op. 4262, at *3

(3d Dep't 2008) (noting that in the absence of a negative declaration or compliance with SEQRA

review, the "petitioner was simply not entitled to default approval."); Pheasant Meadow Farms,

Inc. v. Town of Brookhaven, 31 A.D.3d 770, 771 (2d Dep't 2006) ("Since the preliminary plat

cannot be considered complete, the respondents were not required to act upon the application,

and a default approval was not warranted."); Honess 52 Corp. v. Town of Fishkill, 1 F. Supp. 2d

294, 304 (S.D.N.Y. 1998) (Conner, J.) (discussing discretion afforded to municipal entities under

N.Y. Town Law §§276, 277).

        Plaintiffs' assertion that the Planning Board's disregard of SEQRA deadlines raises

issues of fact for trial on their due process claims is without merit.  See, e.g., Pls' 56.1 Statement

at ¶¶33-36; 39-44; 57.  Plaintiffs' invocation of the Planning Board's failure to follow the time

constraints within SEQRA and the N.Y.C.R.R. does not support the proposition that such failure

resulted in de facto SEQRA approval and commencement of the default preliminary plat

approval processes under the Town Code or N.Y. Town Law.  See Nicklin-McKay, 14 A.D.3d at

861; <u>Omnabuild USA No. 1</u>, 207 A.D.2d at 335. Additionally, Plaintiffs' argument that the Planning Board violated the timing provisions within the Town Code governing the initial sketch plat review and approval process does not support their claim of an entitlement to the issuance of a permit as these Town Code provisions do not contain default approval provisions like the default approval provisions contained within the N.Y. Town Law or Town Code governing preliminary and final plat approval. <u>See</u> Pls' 56.1 Statement at ¶¶33-36; 57 (arguing that delays in the sketch plat approval process form the basis of a due process claim based upon undue delay). Thus, the delay the Plaintiffs identify as occurring during the initial sketch plat review and approval process does not support a finding that the default approval process commenced or that such a delay provided the Plaintiffs with an entitlement to circumvent the entire review and approval process and receive permission to subdivide their land automatically.

No matter how strenuously Plaintiffs insist that the Defendants engaged in bad faith delays during the preliminary phase of their subdivision application process and implore that such bad faith actions raise genuine issues of material fact for trial, absent the issuance of a negative declaration or the filing of a notice of the completion of the draft EIS, the Plaintiffs' subdivision application was not considered a "complete preliminary plat" application under N.Y. Town Law §276(5)(c) because it did not comply with SEQRA. As outlined, New York courts consistently reject applicants' assertions that they enjoy the right to compel a timely and expeditious SEQRA review process. In the absence of a complete preliminary plat neither the mandatory time periods nor the default approval provisions of N.Y. Town Law or the Stanford Town Code were triggered. I therefore conclude, and respectfully recommend that Your Honor should conclude, that the Plaintiffs cannot rely upon the Town Code or the N.Y. Town Law

default provisions to demonstrate that they had an entitlement to the approval of their subdivision permit application from the Planning Board.

ii.      Discretion of Planning Board

Plaintiffs' additional arguments that the Planning Board lacked the discretion to deny the Plaintiffs' application are unconvincing.  First, the Plaintiffs' urging that the Planning Board's engineer concluded that the Plaintiffs had completed almost all of the preliminary plat approval requirements is of no moment to assessing whether the Planning Board was under an affirmative obligation to approve the Plaintiffs' permit request.  See Pls' 56.1 Statement at ¶¶39-44.  The role of the Planning Board's engineer is to offer support and advice to the Planning Board in reviewing, considering and voting on subdivision proposals; the role of the engineer is not to serve as a surrogate to bind the Planning Board to course of action or to a particular vote.  See, e.g., Town Code §140-8(E).  Plaintiffs' insistence that the Planning Board cajoled its engineer to change his evaluation of the Plaintiffs' application does not raise a genuine issue of material fact for trial in the absence of a showing that but for such change the Plaintiffs would have received approval to subdivide their land.  The Town Code empowers the Planning Board to make such decisions independent of its engineer's report and opinions and the change in the report and opinion identified by the Plaintiffs does not further the Plaintiffs' claim of an entitlement to the issuance of the permit from the Planning Board.  Regardless of the expert's report, opinions, and conclusions, the Planning Board retained the discretion to approve or deny Plaintiffs' permit application and any change to the engineer's recommendations that may have occurred does not raise an issue of fact as to whether the Plaintiffs' application was virtually assured approval by the Planning Board.  The Planning Board's engineer's opinion does not render the Planning

Board's authority to approve or deny permits nugatory.

Plaintiffs' additional argument that the extra requirements the Plaintiffs were forced to comply with materialized "out of thin air" and thus were improperly imposed by the Defendants would be sound if the Planning Board was not clothed with the authority to "approve, with or without modification, or disapprove" an applicant's proposal to subdivide his or her land. See Town Code §140-8(F)(3); see also Town Code §140-(9)(D)(2)-(3) (empowering Planning Board to "approve, conditionally approve, with or without modification, or disapprove final plat" submissions). The case law cited by Plaintiffs in support of their theory that the Planning Board cannot impose *ad hoc* requirements on the Plaintiffs as conditions to receiving subdivision approval arose out of a situation where a municipal authority conditioned the issuance of certificates of occupancy on an applicant satisfying requirements that were unrelated to the issuance of the certificates of occupancy. See Sullivan v. Town of Salem, 805 F.2d 81, 85 (2d Cir. 1986) (explaining that building officials predicated issuance of certificates of occupancy on plaintiff's completion of construction of roads which was "unauthorized by, [and] contrary to" state law); see also Dean Tarry Corp. v. Friedlander, 826 F.2d 210, 212-13 (2d Cir. 1987) (discussing Sullivan). In Sullivan the Second Circuit held that the denial of the certificates of occupancy under such circumstances amounted to a due process violation when, absent such ultra vires requirements, the certificates of occupancy would have been issued by the housing authorities because of the applicant's compliance with the applicable housing code requirements. Sullivan, 805 F.2d at 85; see also Dean Tarry, 826 F.2d at 212-13 (noting that Sullivan is dissimilar from instances where a zoning authority has broad discretion to review and consider zoning requests and impose conditions on applicants seeking permits under local zoning laws).

The discretion afforded the Stanford Planning Board pursuant to the Stanford Town Code places this case outside of the parameters of <u>Sullivan</u>'s holding and in accord with Circuit precedent acknowledging that the discretion afforded to municipal entities to impose lawful conditions on applicants "prevent[s] . . . an expectation of success from rising to the level of certainty required to give rise to a cognizable property right." <u>See</u> <u>Dean Tarry</u>, 826 F.2d at 213. Dissmilar from the approval of the plaintiff's application in <u>Sullivan</u>, the approval of the Plaintiffs' subdivision request in this case is not guaranteed upon the Plaintiffs satisfying certain objective criteria. <u>See</u> <u>Sullivan</u>, 805 F.2d at 85 ("If the houses complied with the applicable state and municipal requirements, there was no element of discretion of judgment remaining for the building official to exercise . . . ."). The Stanford Town Code does not assure the approval of Plaintiffs' application simply upon the Plaintiffs satisfying a series of rote, objective criteria; the Town Code vests the Planning Board with the authority to approve or disapprove subdivision applications and <u>Sullivan</u>'s holding does not militate a different conclusion.

The cases cited by Plaintiffs in support of their vested rights theory and their theory that their application for subdivision was virtually guaranteed but for the Planning Board's alleged due process violations fail to convince the undersigned that the facts of this case give the Plaintiffs a constitutionally protected property interest in the issuance of a discretionary permit from the Planning Board. Delay alone, no matter how forcefully argued in Plaintiffs' memoranda, is not sufficient to establish the Plaintiffs' constitutional entitlement to the issuance of a discretionary permit from the Planning Board. I therefore conclude, and respectfully recommend that Your Honor should conclude, that the Plaintiffs cannot establish that they were entitled to the issuance of their subdivision permit through the default approval provisions of

N.Y. Town Law or the Stanford Town Code, and also cannot establish that approval of their permit was virtually assured under the provisions of the Town Code but for the alleged due process violations. Plaintiffs, therefore, cannot establish a cognizable property interest supporting either their substantive or their procedural due process claims and the Defendants' motions for summary judgment seeking dismissal of these claims should be granted.

      2.      Equal Protection Claim

          a.      Equal Protection Class of One Standards

Plaintiffs also advance a selective enforcement equal protection claim against the Defendants, alleging that the Defendants have required the Plaintiffs to comply with prerequisites that have not been imposed on other permit applicants. See Comp. at ¶125. Plaintiffs' equal protection cause of action is best classified as a "class of one" equal protection claim predicated upon the theory that the Plaintiffs have been singled out for disparate treatment absent a valid, rational basis. See Clubside, 468 F.3d at 158-59 (citing Vill. of Willowbrook v. Olech, 528 U.S. 562 (2000)). Class of one equal protection claims allow complainants to bring selective enforcement claims where the motivation for the alleged unequal treatment is not based upon a protected classification, such as race or gender, or upon the exercise of a plaintiff's fundamental constitutional rights, but is based upon an alleged irrational basis or motivation. See Olech, 528 U.S. at 564.[9]

---

[9] The Second Circuit has noted that there remains an open question in this Circuit as to whether the Supreme Court's decision in Olech invalidated Second Circuit case law holding that a plaintiff must allege that a defendant acted with malice or ill will in order to establish a class of one equal protection claim. See Prestopnik v. Whelan, 249 Fed. Appx. 210, 213 n.1 (2d Cir. 2007). As with the other Courts that have faced this uncertainty, this Court need not reach this issue because the Plaintiffs are unable to establish a genuine issue of material fact on the first element of their equal protection class of one claim.

In order to assert a valid class of one equal protection claim the Plaintiffs must establish (1) that they were treated differently than others who are similarly situated and (2) that such differing treatment was irrational. Cine SK8, 507 F.3d at 778. Plaintiffs "must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." Clubside, 468 F.3d at 159 (citing Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005)). Our Circuit has rationalized the need for this more robust showing of similarity because class of one equal protection claims rely upon a plaintiff's assertion of differing treatment as evidence of the defendant's irrational conduct. Id. (stressing that the similarity prong of a class of one claim "is offered to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose . . . is all but certain.") (quoting Neilson, 409 F.3d at 105). Thus, in the absence of differing treatment based upon a plaintiff's protected class or the exercise of his or her fundamental constitutional rights, more weight is shifted to the first prong of a class of one equal protection claim to counterbalance the lesser showing needed to satisfy the second prong. Id.

Whether the Plaintiffs and their comparators are similarly situated is a question of fact. Id.; see also Cine SK8, 507 F.3d at 790. Like all questions of fact, should a plaintiff fail to establish a genuine issue of material fact on this element of his or her claim, a court may grant a defendant's motion for summary judgment dismissing this claim. See Cine SK8, 507 F.3d at 790-91; Clubside, 468 F.3d at 159.

b.     Plaintiffs' Equal Protection Claim

A review of the undisputed facts of this case lead me to conclude, and respectfully recommend that Your Honor should conclude, that the Plaintiffs have failed to establish a

genuine issue of material fact on the similarly situated prong of their class of one equal protection claim and that the Defendants' motion for summary judgment should be granted. Plaintiffs' 56.1 Statement only establishes that another land developer sought similar permission from the Defendants to subdivide land and experienced similar delays with the approval process. See Pls' 56.1 Statement at ¶¶28, 57(G) (alleging improper treatment by the Planning Board against Waterlands project developer). These allegations of similar treatment, rather than of dissimilar treatment, do not establish that the Plaintiffs were treated differently than their comparators; Plaintiffs have only submitted evidence of similar treatment, which is the antithesis of any type of equal protection claim. See Pls' 56.1 Statement at ¶57(G) ("Other property owners were treated *in the same* high-handed totally illegal manner.").

The only evidence that appears in the record before the Court that suggests some degree of disparate treatment is an affidavit submitted by Mark Graminski, Plaintiffs' engineer. See Pls' Exhibits, Volume I, Ex. B, Affidavit of Mark Graminski. This lone affidavit, however, does not present sufficient evidence to establish a triable issue of fact on the "extremely high degree of similarity" a plaintiff must establish between himself or herself and his or her comparators in order to assert a class of one equal protection claim. See Clubside, 468 F.3d at 159. Mr. Graminski offers a nebulous assertion that he has never experienced the degree of delay he has experienced while working with the Plaintiffs. See Pls' Exhibits, Volume I, Ex. B, Affidavit of Mark Graminski at ¶¶3, 28. Mr. Graminksi's affidavit, however, does not offer any specificity about the other applicants with whom he has worked or how the other applicants are similarly situated to the Plaintiffs. Mr. Graminski's *ipse dixit* of differing treatment and uncanny delay falls short of the comprehensive showing the Plaintiffs must make in order to establish a genuine

issue of material fact on the first prong of their class of one equal protection cause of action.

Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that the Plaintiffs have failed to establish a genuine issue of material fact on the similarity prong of their class of one equal protection claim and that the Defendants' motion for summary judgment seeking dismissal of the Plaintiffs' selective enforcement claim should be granted.

D.      First Amendment Violations

Plaintiffs also assert claims arising under the First Amendment against the Defendants based upon the Defendants "prohibiting the plaintiffs from speaking with other applicants and from speaking or communicating with Board appointed professional consultants assigned to plaintiffs' project." See Comp. at ¶2.  Plaintiffs' primary contention in support of this claim is that Defendant Fernandez barred the Plaintiffs and their agents from communicating with the Planning Board's engineer and retained attorney and directed that all of the Plaintiffs' submissions pertaining to their subdivision application had to be mailed directly to the Planning Board rather than to one of the Planning Board's consultants.  See Pls' 56.1 Statement at ¶52. Plaintiffs present this course of action as creating a "wall of silence" around the Planning Board and its consultants, thus limiting Plaintiffs' First Amendment rights to enjoy "meaningful discussion and presentation by Plaintiffs before the Planning Board." See Pls' 56.1 Statement at ¶51; Comp. at ¶118.

Defendants have not presented arguments to the Court seeking summary dismissal of the Plaintiffs' First Amendment claims in their motions for summary judgment.  From the evidence submitted by the Plaintiffs and Defendants in connection with the pending motions for summary judgment, however, the undersigned believes that a disposition of the Plaintiffs' First

Amendment allegations can be rendered as a matter of law. For the following reasons I

conclude, and respectfully recommend that Your Honor should conclude, that the Plaintiffs'

assertions fail to establish that they endured meaningful and actual injury as a result of these

alleged actions and that the Plaintiffs therefore lack standing to raise these constitutional claims.

     1.     Nature of Plaintiffs' Allegations

Plaintiffs' Complaint suggests that the Plaintiffs' First Amendment rights to freedom of

speech were violated when Defendant Fernandez forbade them from speaking with the Planning

Board's engineer and attorney and when Defendant Fernandez required that the Plaintiffs refrain

from mailing their subdivision application documents to these consultants. See Comp. at ¶¶116-

118. Although there is an element of speech involved in these actions, the tenor of the Plaintiffs'

assertions leads me to conclude that the Plaintiffs' allegations invoke their First Amendment

rights to petition the government for redress of their grievances rather than their First

Amendment rights to free speech. A private citizen's right to petition the government for redress

of his or her grievances is on equal footing with a private citizen's right to speak freely and the

analysis germane to free speech claims and to right to petition claims is identical. See White

Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1059 (2d Cir. 1993) ("The First Amendment

right to petition the government for a redress of grievances . . . is generally subject to the same

constitutional analysis as the right to free speech.") (quotations omitted). This congruity arises

from the Supreme Court's recognition that there exists no hierarchy among First Amendment

liberties. See, e.g., Cobb v. Pozzi, 363 F.3d 89, 105 (2d Cir. 2004) (discussing McDonald v.

Smith, 472 U.S. 479, 482 (1985)).

Plaintiffs' allegations of First Amendment impropriety fall within a narrow spectrum of

possible First Amendment claims.  First, Plaintiffs assert the instant claims as private citizens advancing personal interests as opposed to government employees speaking out on matters of public concern.  See, e.g., Reuland v. Hynes, 460 F.3d 409, 416-18 (2d Cir. 2006) (discussing the public concern distinction between First Amendment claims brought by a plaintiff in his or her capacity as a government employee as opposed to in his or her capacity as a private citizen).  Second, Plaintiffs' claims fall outside of the common area of First Amendment litigation addressing prisoner-plaintiffs' claims of First Amendment violations.  See, e.g., Beard v. Banks, 548 U.S. 521 (2006) (assessing constitutionality of limitations on types of periodicals prisoners can possess under the "legitimate penological objective" standard of review); Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001) (explaining that prisoners enjoy reduced First Amendment protections in the prison milieu).  Finally, Plaintiffs' First Amendment claims do not address restrictions placed on their ability to communicate with government officials in a physical forum, such as their right to speak during a public hearing or in a public park.[10]  Such limitations, if present, would require the Court to consider the nature of the forum in which the Plaintiffs sought to exercise their First Amendment rights and the corresponding degree of interest established by the government justifying any limits placed on such constitutional activity.  See, e.g., Make the Road by Walking, Inc. v. Turner, 378 F.3d 133, 142-43 (2d Cir. 2004) (outlining the "forum" analysis used to evaluate claims of free speech violations).

_____

[10]  Although Plaintiffs suggest in their Complaint that the Defendants impeded the Planning Board's consideration of the Plaintiffs' application during several Planning Board meetings, the Plaintiffs do not allege that they were prevented from speaking during any of the Planning Board meetings.  See Comp. at ¶¶116-118.  Plaintiffs assert, rather, that they were only allowed to communicate with the Planning Board during its public meetings.  See Pls' 56.1 Statement at ¶52 ("[Plaintiffs] were permitted to speak only to the Chairman, and only at Planning Board meetings.") (emphasis in original).

2.      Viability of Plaintiffs' First Amendment Allegations

Dispositive to the instant claims is whether the Plaintiffs have identified sufficiently the injuries they sustained as a result of the Defendants' allegedly unconstitutional conduct.  It is bedrock constitutional law that a plaintiff must establish his or her standing to assert a claim in court.  See Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11-12 (2004).  Standing, however, not only ensures that the proper party brings a particular lawsuit, but also ensures that the proper plaintiff brings a suit based upon an actual or imminent injury that can be redressed by the courts.  Id. at 12 ("The plaintiff must show that the conduct of which he [or she] complains has caused him [or her] to suffer an 'injury-in-fact' that a favorable judgment will redress.").  Like ripeness, standing principles emerge from Article III of the U.S. Constitution and from the prudential limitations that exist on federal court jurisdiction.  Id.  Whether a plaintiff has standing is a matter of law that cannot be waived or stipulated to by the parties and must be addressed by the Court on its own initiative if necessary.  See LaFleur v. Whitman, 300 F.3d 256, 268-69 (2d Cir. 2002).

In order for a plaintiff to have standing to assert a particular cause of action that plaintiff must establish that he or she suffered a concrete injury-in-fact as a result of a defendant's wrongful conduct.  See Brooklyn Legal Servs. Corp. v. Legal Servs., 462 F.3d 219, 226 (2d Cir. 2006).  A plaintiff is entitled to present his or her claims of First Amendment constitutional wrongdoing only when "a plaintiff has suffered 'threatened or actual injury' that results from a defendant's alleged illegal act."  Id.  In the First Amendment context, "allegations of a 'subjective chill' of free speech rights will not suffice to satisfy the injury-in-fact requirement."  Id. (citing Laird v. Tatum, 408 U.S. 1, 13-14 (1972)).  The Plaintiffs must evince a "specific

69

present or future objective harm" that has caused them injury or that is likely to cause them injury in order to bring such claims.  Id. (citing Latino Officers Ass'n v. Safir, 170 F.3d 167, 170 (2d Cir. 1999)).

Although the Plaintiffs advance allegations that the Defendants violated their First Amendment rights by "determining whom Plaintiffs could and could not speak with, [] by prohibiting them from speaking with other persons with business before the Planning Board," see Comp. at ¶¶116, 117, and by requiring that "all documents be sent only to the Chairman at Town Hall," see Pls' 56.1 Statement at ¶52, these allegations do not raise the possibility – nor could they – that the Plaintiffs were literally prohibited from speaking with such other persons or from submitting such documents to persons other than Defendant Fernandez.  Plaintiffs retained the ability the seek out and speak to other applicants appearing before the Planning Board before and after the Planning Board's meetings and Plaintiffs could send any correspondence they wished to the Planning Board's consultants.[11]  Whether the Plaintiffs' submissions would be considered or acted upon by on the Planning Board is a separate matter that does not retain a constitutional dimension.  See Prestopnik v. Whelan, 253 F. Supp. 2d 369, 375 (N.D.N.Y.), aff'd, 83 Fed. Appx. 363 (2d Cir. 2003) (quoting Cronin v. Town of Amesbury, 895 F. Supp. 375, 389-90 (D. Mass. 1995), aff'd, 81 F.3d 257 (1st Cir. 1996) ("The right to petition government does not create in the government a corresponding duty to act.")).  Additionally, the Plaintiffs do not allege that they were denied the opportunity to appear before the Planning

_____

[11]  By parity of reasoning, the Plaintiffs would have no more a valid First Amendment claim that their rights to petition the courts were violated if one of the Defendants told the Plaintiffs that they could not file a lawsuit in this Court.  The actions identified by the Plaintiffs as amounting to constitutional error simply do not present meaningful constitutional injury which can be redressed by a jury award.

Board to submit their application, to discuss their application, or to raise concerns about the speed of the Planning Board's review and consideration of their application. See Prestopnik, 253 F. Supp. 2d at 375 (noting plaintiff's continued ability to submit written applications to board of education negated First Amendment right to petition cause of action); see also Piscottano v. Town of Somers, 396 F. Supp. 2d 187, 206 (D. Conn. 2005) (explaining that right to petition government does not include right to present grievances to the government in any manner the plaintiff wishes).[12] Most importantly, the fact that the Plaintiffs were never subject to a risk or threat of prosecution for taking such actions places this case outside of the common exception to these standing principles that recognizes a cognizable injury when a plaintiff faces the likely threat of criminal prosecution for exercising his or her First Amendment rights. See Brooklyn Legal Servs. Corp., 462 F.3d at 227 (citing Am. Booksellers Found. v. Dean, 342 F.3d 96, 101 (2d Cir. 2003) ("finding standing because a statute 'presented plaintiffs with the choice of risking prosecution' or forgoing purportedly protected Fist Amendment activity.")).

Courts should not take allegations of constitutional impropriety lightly. See Brooklyn

---

[12] Prestopnik and Piscottano address factual scenarios which are only slightly different than those of the instant action. The plaintiffs in both cases advanced denial of right to petition claims against local municipal boards based upon the boards' refusal to allow them to appear before the boards and speak. In concluding that the plaintiffs failed to articulate First Amendment claims, both courts noted that the plaintiffs retained the auxiliary ability to submit written correspondence to the boards and that such ability allowed them to present meaningful petitions for redress of their grievances. Prestopnik, 253 F. Supp. 2d at 375; Piscottano, 396 F. Supp. 2d at 206. In this case, just the opposite factual scenario is presented, but the same legal result is warranted: although the Defendant told the Plaintiffs to submit all correspondence to the Planning Board directly and not to the Planning Board's consultants, the Plaintiffs always retained the ability to appear before the Planning Board during its public meetings to raise and present their concerns involving their subdivision application. Prestopnik and Piscottano, although only persuasive district court authority, merit the Court's consideration when analyzing the Plaintiffs' unconventional First Amendment claim.

Legal Servs. Corp., 462 F.3d at 226 ("Demonstrating injury in fact is thus one indicia that judicial power is not lightly being invoked.").  Allegations of constitutional infirmity, however, must be monitored closely to ensure that there exist real cases or controversies of constitutional magnitude for the Court to entertain.  Given that the Plaintiffs were subject only to an ephemeral limitation on their First Amendment communicative abilities with the Planning Board's consultants that posed no threat of actual injury to the Plaintiffs' constitutional rights, and that the Plaintiffs were not subject to actual limitations resulting in an actual inability to petition or communicate with the Planning Board, I conclude, and respectfully recommend that Your Honor should conclude, that the Plaintiffs' allegations of First Amendment violations do not evince that the Plaintiffs sustained a concrete injury-in-fact warranting judicial scrutiny.  Although the right to seek redress of one's grievances is "among the most precious of the liberties safeguarded by the Bill of Rights," United Mine Workers v. Illinois State Bar Ass'n, 389 U.S. 217, 222 (1967), plaintiffs articulating a violation of this right must establish an actual compensable injury in order to present such a claim in court.

Upon consideration of the Plaintiffs' Complaint and their assertions of material fact requiring trial, I conclude, and respectfully recommend that Your Honor should conclude, that the Plaintiffs lack standing to assert these putative First Amendment claims and that these claims should therefore be dismissed.

E.      Supplemental State Law Claims

Plaintiffs remaining claims against the Defendants are presented to this Court for consideration under its grant of discretionary supplemental jurisdiction.  See 28 U.S.C. §1367. In light of the undersigned's recommendations that the Plaintiffs' federal constitutional claims

are not ripe for review, that the Plaintiffs have failed to establish a cognizable property interest, that the Plaintiffs have failed to establish a genuine issue of material fact on their selective enforcement equal protection claim, and that the Plaintiffs have failed to establish a concrete injury-in-fact giving them a right to assert their putative First Amendment violations in this Court, I conclude, and respectfully recommend that Your Honor should conclude, that the Court should decline to exercise supplemental jurisdiction over the balance of the Plaintiffs' state law claims and that such claims should be dismissed. See United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well); Kolari v. New York Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006) (explaining that a district court may exercise supplemental jurisdiction over pendent state law claims after all federal claims are dismissed when the state law claims raise issues closely tied to federal policy).  In this land-use challenge, where the Second Circuit has admonished plaintiffs for improvidently bringing local land use disputes before the federal courts for resolution, I respectfully recommend that there is no compelling federal policy supporting the exercise of supplemental jurisdiction over Plaintiffs' ancillary state law claims. See Harlen Assocs., 273 F.3d at 505 ("We repeat the admonition that federal courts should not become zoning boards of appeal. . . .  Litigants do themselves a disservice when they attempt to clothe state causes of action in the garb of a federal claim . . .").

## CONCLUSION

For the aforementioned reasons I conclude, and respectfully recommend that Your Honor should conclude, that the Defendants' motions for summary judgment, Docket numbers 41 and 47, seeking dismissal of the Plaintiffs' federal claims should be granted, that the Court should

decline to exercise supplemental jurisdiction over the Plaintiffs' supplemental state law claims,

and that the Plaintiffs' Complaint should be dismissed in its entirety from this Court.

## NOTICE

Pursuant to 28 U.S.C. §636(b)(1), as amended, and FED. R. CIV. P. 72(b), the parties shall

have ten (10) days, plus an additional three (3) days, pursuant to FED. R. CIV. P. 6(d), or a total of

thirteen (13) working days, see FED. R. CIV. P. 6(a), from the date hereof, to file written

objections to this Report and Recommendation. Such objections, if any, shall be filed with the

Clerk of the Court with extra copies delivered to the chambers of The Honorable Charles L.

Brieant at the United States Courthouse, 300 Quarropas Street, White Plains, New York, 10601,

and to the chambers of the undersigned at the same address.

Failure to file timely objections to this Report and Recommendation will preclude later

appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Brieant.

Dated: July 16, 2008
       White Plains, New York

Respectfully Submitted,

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York

74

A copy of the foregoing Report and Recommendation has been sent to the following:

The Honorable Charles L. Brieant, U.S.D.J.
Counsel of Record for Plaintiff Patrisha Osborne
*Pro se* Plaintiff George Osborne
Counsel of Record for Defendant Fernandez and for the Town Defendants